768 F.2d 619
 Thomas MORROW, Individually and in Behalf of all others
similarly situated, Plaintiff-Appellee,
v.
Jack HARWELL, Individually and in his official capacity as
Sheriff of McLennan County, Texas, et al.,
Defendants-Appellants.
 No. 84-1610.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 2, 1985.
 
 W.C. Haley, Herbert S. Bristow, Waco, for defendants-appellants.
 John A. Buckley, Jr., James C. Harrington, American Civil Liberties Foundation of Texas, Austin, Tex., for plaintiff-appellee.
 Ruben Rendon, Houston, Tex., for amicus--League of United Latin Maerican Citizens.
 Malcolm Greenstein, Austin, Tex., for amicus--Citizens United for Rehabilitation of Errants.
 Appeal from the United States District Court for the Western District of Texas.
 Before REAVLEY, JOHNSON and HIGGINBOTHAM, Circuit Judges.
 PATRICK E. HIGGINBOTHAM, Circuit Judge:
 
 
 1
 The Sheriff of McLennan County, Texas and other county officials appeal a magistrate's ordered changes in the County's jail facilities and rules. The orders followed trial of a class action suit filed by a prison inmate who alleged denial of access to the courts, as well as constitutional deprivations relating to the jail's policies on visitation, mail, and disciplinary procedures. We affirm the magistrate's declaration that the County's plan for inmate access to the courts is inadequate. We reverse the declaration that certain physical facilities for visitation are inadequate but affirm, for the most part, the other declarations of invalidity. We set aside all companion injunctive decrees as having been issued without sufficient necessitating circumstances.
 
 
 2
 * This suit was filed in March 1976, when McLennan County housed its prisoners in the "old jail," a facility built in the 1950's. Thomas Morrow, an inmate representing a class that included "all past, present and future inmates of McLennan County Jail," complained that inmates' rights under the First, Sixth, Eighth and Fourteenth Amendments were being violated by a host of conditions at the jail, including disciplinary procedures, inmate conduct rules, grievance procedures, visitation and mail privileges, supervision, clothing, hygiene, food, exercise, medical treatment, dental treatment, mental health services, jail design, jail capacity, jail sanitation, and cell space, as well as lack of access to legal materials, attorneys, telephones, newspapers, periodicals, radios and televisions.
 
 
 3
 At about the time suit was filed, the County began construction of a new jail and made plans to upgrade the old jail. It was the County's objective that when the two facilities were combined the County would be in compliance with the Texas Jail Standards Act, Tex.Rev.Civ.Stat.Ann. art. 5115 et seq. (Vernon 1975). The suit lay dormant until the new jail was completed in January 1981. At that time, many of the complaints fell away.
 
 
 4
 By consent of the parties, the remaining issues were tried to a magistrate in the fall of 1982. After conducting a post-trial hearing on the principal dispute, whether the County had afforded its prisoners adequate access to the courts as required by Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the magistrate filed a final decree in March 1984. The decree found the County to be in compliance with constitutional standards on the issues of supervision, diet, medical care, education, recreation, overcrowding, and detention conditions for pre-trial detainees, but not on the remaining points. The magistrate ordered the County to provide the following relief: (1) access to the courts through either an adequate law library or legal assistance or a combination of both; (2) modification of visitation policies (a) to permit minors to visit inmates, (b) to permit weekend visitation, (c) to equalize visitation rights of male and female inmates, and (d) to upgrade communication facilities in the visitation areas at the old jail; (3) establishment of disciplinary procedures consistent with Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); and (4) establishment of written guidelines for mail practices consistent with Guajardo v. Estelle, 580 F.2d 748 (5th Cir.1978). After a hearing, the magistrate awarded plaintiffs $47,950.00 in attorney fees. The County challenges the relief granted as well as the award of attorney's fees.
 
 II
 
 5
 * We turn first to the issue of access to the courts. The relevant facts are not disputed. There is no law library at the jail, but legal sources are available to the inmates through a weekly bookmobile, drawing upon the Waco-McLennan County Public Library. This library contains a number of statutory codes, digests, and form books, as well as the advance sheets of certain reporters from the McLennan County Law Library. Although the County contends that notices explaining availability of this service were posted in the jail library, the magistrate found that "inmates have not been made aware of this program or of the law books available to check out...." There are no digests or other research materials available at the jail itself; therefore, the inmates cannot determine in advance which books they might wish to request.
 
 
 6
 McLennan County is located in the central part of Texas. Its seat is the City of Waco, the home of Baylor University. The county jail's library program is supplemented by paralegal assistance from two Baylor University law students who work under the supervision of a practicing attorney. The students, paid an hourly wage by the County, visit inmates who request legal assistance, but are prohibited by state law from giving legal advice. See Tex.Rev.Civ.Stat.Ann. art. 320a-1 Secs. 10(a), 19 (Vernon Supp.1985). The students can assist prisoners only by providing copies of forms, cases, and other written legal materials. The copies are made for inmates at their request at a rate of ten cents per page, with free copies for indigents. Assertedly to deter abuse, jail officials did not inform indigent inmates that they could obtain copies without charge.
 
 
 7
 There was testimony that, although the law students employed by the County are not supposed to give legal advice, they interpreted some legal authorities and occasionally helped the inmates to complete legal forms. The County does not rely on these enthusiasms to the extent they may occasionally have gone further than the state law permits.
 
 2
 
 8
 The source of the prisoners' asserted right to a law library is the Supreme Court's decision in Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). In Bounds the Court held that prisoners have a constitutional right of adequate, effective and meaningful access to the courts, a right which "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing ... adequate law libraries or adequate assistance from persons trained in the law." Id. at 828, 97 S.Ct. at 1498. Apparently, the right is not extended to all legal filings, but applies only to presentation of constitutional claims, such as civil rights complaints and state and federal habeas petitions. Id. at 825, 827-28 & n. 17, 97 S.Ct. at 1496, 1497-98 & n. 17. The inmates' ability to file is not dispositive of the access question, because the Court in Bounds explained that for access to be meaningful, post-filing needs, such as the research tools necessary to effectively rebut authorities cited by an adversary in responsive pleadings, should be met. Id. at 825-26, 97 S.Ct. at 1496-97. In short, this found right of access includes the ability to file a legally sufficient claim. Bonner v. City of Prichard, 661 F.2d 1206, 1212 (11th Cir.1981) (en banc).
 
 
 9
 Perhaps because their textual footing in the Constitution is not clear, these principles suffer for lack of internal definition and prove far easier to state than to apply. For example, there has been confusion in the cases regarding Bounds 's requirement that all prisoners be given meaningful access to the courts. Dicta in Cruz v. Hauck, 627 F.2d 710, 720-21 (5th Cir.1980) (Cruz III ) suggests that, given that the right recognized in Bounds was one of meaningful access to the courts, a library alone may not satisfy the Constitution, at least for those inmates who cannot read English or who are otherwise illiterate. Other courts have rejected the notion that if a Bounds library is provided, something more may nevertheless be required. See Cepulonis v. Fair, 732 F.2d 1, 6 (1st Cir.1984). The issue is not before us because the magistrate concluded that the evidence presented on the literacy and educational backgrounds of the inmates at the jail was "inconclusive."
 
 
 10
 While Bounds did not read its found right of access in a wholly mechanical fashion, the Court was firm in its command that the right be met with books or legal assistance or both; it foreclosed the question of the practical utility of a library, concluding that access to a library is access to the courts. Access to courts can be secured, though, by means other than the furnishing of a law library containing the suggested volumes. A complete library, as described in Bounds, or assistance by paralegals or some lesser amount of each in combination might be used. Indeed, access to paralegals and writ writers may bear a rough inverse relationship to the library materials required. 430 U.S. at 831-32, 97 S.Ct. at 1499-1500.
 
 
 11
 Given the tension inherent in requiring that lawyers' tools be made available despite the absence of any constitutional right to lawyers, the Bounds requirement is inevitably inexact. For those who question the utility or cost of a Bounds library, access can be met by furnishing legal assistance even though the legal assistance is not independently required by the Constitution. To the extent that the operative reality of Bounds is that it leverages legal assistance that cannot be justified in direct terms, it is a leverage built into Bounds and, whatever its dissembling dimensions, we must obey it.
 
 3
 
 12
 The magistrate concluded that McLennan County's program is insufficient under Bounds. We are constrained to agree. We hold that the bookmobile check-out system, accompanied by circumscribed assistance from law students, does not meet the Bounds requirement. In the absence of some sort of direct legal assistance, which need not be by trained lawyers, the inmates must be given access to a library as required in Bounds. That access is not met by a system allowing a prisoner to check out books through a weekly bookmobile. The Federal Supplement, the Federal Reporter and the Supreme Court Reporter today consist of a total of approximately fifteen hundred volumes. Even a quick research project by a trained lawyer may require reference and cross reference to numerous volumes. Such a task would be impossible to complete with no legal assistance and only the limited library program presently in place. We affirm the magistrate's declaration that the present jail program is not adequate.
 
 
 13
 We add separate comment on only one of the County's arguments, one not expressly addressed by the magistrate. The County contends that because most of the 160 inmates who occupy the jail at any one time are confined for only brief periods, the bookmobile/paralegal program is sufficient to meet the needs of those few non-transient inmates who are entitled to Bounds access. As we observed in Cruz v. Hauck, 515 F.2d 322, 333 (5th Cir.1975) (Cruz II ), cert. denied, 424 U.S. 917, 96 S.Ct. 1118, 47 L.Ed.2d 322 (1976), there is no right of access to the courts for those prisoners whose "brevity of confinement does not permit sufficient time ... to petition the courts." No easily-stated test has emerged for defining how lengthy a stay must be before the right is triggered. Compare the opinions of Judges Haynsworth and Hall in Williams v. Leeke, 584 F.2d 1336 (4th Cir.1978), cert. denied, 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979).
 
 
 14
 The principal evidence presented concerning the number of inmates held at the county jail for significant lengths of time was a report, prepared in early October 1982, listing the length of stay for each inmate who entered the jail in July 1982, a "representative" month according to prison official Dan Weyenberg. Of these 482 entering inmates, 33 were still confined at the time of the report; three had been held for over 90 days. In addition, two prisoners testified at the October 1982 trial that they had been held at the jail since June 1982. This record, while sparse, permits an inference that some McLennan County jail inmates were incarcerated long enough to have had a right of access to the courts while there. Although the number of inmates entitled to that right may have been small, the right of access is of an individual rather than a group nature. The magistrate was entitled on these facts to enter a declaration that the bookmobile/paralegal system did not satisfy inmates' rights of access to the courts under Bounds.
 
 
 15
 Of course, the number of inmates at a given facility who are there long enough to have Bounds rights is important to what the defendant must do to remedy the violation. With only a few nontransient inmates for example, judicial access can be met with much less than otherwise.
 
 
 16
 The magistrate, though, did not require the County to construct a library or to adopt any specific program for legal assistance, nor do we. Counsel for the inmates indicated at oral argument, and amicus curiae LULAC agrees, that most complaints regarding access to the courts would be alleviated if the Baylor students now performing paralegal work were authorized to practice law subject to supervision by a licensed attorney. See State Bar of Texas, Rules and Regulations Governing Participation of Qualified Law Students and Qualified Unlicensed Law School Graduates in the Trial of Cases in Texas (unpublished, approved by the Supreme Court of Texas, December 1978). It is not clear that the assistance provided by the Baylor students constituted the unauthorized practice of law. While a program approved by the state bar might end such speculation it is not a prerequisite to a valid system under Bounds. We say only that greater access to a library than afforded by the checkout system is required unless greater assistance by students, paralegals or writ writers is furnished.
 
 III
 
 17
 The County next attacks the magistrate's orders requiring jail officials to "immediately and permanently operate the McLennan County Jail" in accordance with specified policies on jail visitation. The magistrate sustained the four complaints about visitation: (1) visitation facilities at the old jail afforded inmates less privacy and fewer opportunities for communication than those at the new jail; (2) visitation hours for female inmates were fewer than those for male inmates; (3) persons age seventeen or younger were not allowed to visit inmates; and (4) the jail was open for visits on Tuesdays and Thursdays only--no weekend visitation was permitted. The magistrate enjoined the County to upgrade the visitation facilities at the old jail, to equalize visitation privileges for men and women, and to permit both minor and weekend visitation. We address each in turn.
 
 
 18
 * First, the magistrate held that the facilities in the old jail were inadequate for visitation. The record testimony cited by the magistrate in support of his finding refers to the fact that at the old jail, visitors had to speak to inmates through openings below a window. There was some testimony that this arrangement made it awkward for some visitors to look at inmates while speaking to them, and that their conversations were not fully private. At the new jail, by contrast, inmates talked by telephone to their visitors at the visitation windows.
 
 
 19
 The inmates claim that the visitation facilities of the old jail deny their constitutional rights. They argue that their claimed rights are taken if penological purposes can be achieved in a manner less restrictive of their rights as free citizens. As we will explain, this abstract statement removes a familiar inquiry from its context and significantly skews its focus. It suffers from the not uncommon vice of analogical reasoning untethered to constitutional text, a flaw we have identified and condemned. See Chrysler Corp. v. Texas Motor Vehicle Commission, 755 F.2d 1192, 1202 (5th Cir.1985). The beginning point for claims of lost constitutional rights is their textual source. While the magistrate did not identify the source of the found right, there are three possibilities, the First, Fourteenth and Eighth Amendments. We turn to each in turn.
 
 
 20
 McMurry v. Phelps, 533 F.Supp. 742, 764 (W.D.La.1982), derived a right to jail visitation from a perceived First Amendment guarantee of freedom of association, and found a constitutional deprivation on facts similar to these. In Thorne v. Jones, 765 F.2d 1270, 1272-1274 & n. 6 (5th Cir.1985) though, we rejected the notion that the First Amendment necessarily embraces a visit with a prison inmate, and expressly disapproved McMurry 's First Amendment analysis. While in Thorne we were addressing the asserted rights of convicted felons, we need not pause here to elaborate on the asserted visitation rights under the First Amendment of pretrial detainees. Finding protected speech in ordinary visits with detainees is problematic at best. Any such right, and we see none, is vindicated in the due process inquiry that follows.
 
 
 21
 Because a significant number of inmates using the old jail's visiting facilities are pretrial detainees, we must weigh the conditions there under the Fourteenth Amendment as outlined in Block v. Rutherford, --- U.S. ----, 104 S.Ct. 3227, 3231, 82 L.Ed.2d 438 (1984), and Bell v. Wolfish, 441 U.S. 520, 535, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979). We "must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.... [I]f a restriction or condition is not reasonably related to a legitimate goal--if it is arbitrary or purposeless--a court permissibly may infer that the purpose of the governmental action is punishment...." Rutherford, 104 S.Ct. at 3231, quoting Wolfish, 441 U.S. at 538, 539, 99 S.Ct. at 1874.
 
 
 22
 The magistrate found that the "inadequacy of the facility [was] not justified by any legitimate security concern," and ordered it upgraded. This approach misconceives the Rutherford/Wolfish analysis. The unexplained deficiency must be one from which a purpose of punishment can be inferred. It does not necessarily follow from the fact that more hospitable or convenient facilities can be constructed, as the County did in its new jail, that not doing so is punitive. Wolfish, 441 U.S. at 537, 99 S.Ct. at 1873. Rather, the question, directly put, is whether pretrial detainees are being "punished." Restrictions unsupported by state interests may well lead to a conclusion that liberty interests of pretrial detainees are being taken without warrant, in view of those inmates' status as detained but unconvicted citizens. But such restrictions support an inference that they are calculated to punish pretrial detainees because of the lack of any legitimate state purpose behind them; they are properly termed arbitrary. In determining whether the physical facility for visitation was arbitrary, we must consider that the cost of reconstructing it was a factor that the County could weigh against the inmates' asserted needs. Otherwise stated, while the expense of achieving constitutional compliance may not justify the status quo, expense is relevant to whether the Constitution was violated. In Rutherford, for example, the Supreme Court viewed the cost of constructing additional facilities to accommodate contact visits as a legitimate ground for denying those visits altogether. 104 S.Ct. at 3233-34 n. 9.
 
 
 23
 Here, because the expense of building new visitation facilities in the old jail was plainly a legitimate state concern and the old facilities could hardly be termed egregious, the inmates did not make the case for interfering with the discretion of the jail administrators. County officials were entitled to strike a balance between a penological ideal distinctly secured by no constitutional text and the financial cost of change.
 
 
 24
 Finally, the Eighth Amendment approach is easily dispatched; "for convicted prisoners, visitation privileges are a matter subject to the discretion of prison officials." Jones v. Diamond, 636 F.2d 1364, 1376-77 (5th Cir.) (en banc), cert. dism'd, 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981), quoting McCray v. Sullivan, 509 F.2d 1232, 1334 (5th Cir.), cert. denied, 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975). The jail officials' decision to continue use of the old jail's visiting room was within their discretion. Nor does the confinement in the old jail of some pretrial detainees alter these results. We say without elaboration that the inconvenience of the visitation facility is not cruel and unusual.
 
 
 25
 It developed at oral argument that the magistrate's order was also, in large part, an indirect effort to correct what the magistrate perceived to be a problem of discriminatory assignment of prisoners. That is, the problem addressed was that the opportunity to assign prisoners to the older, adequate but relatively uncomfortable, jail rather than to the new jail might be a punitive weapon in the hands of the jailer. The magistrate, however, did not find that discriminatory assignment existed as an independent constitutional violation. The remedy for any discriminatory assignment is its prohibition. The magistrate erred in directing changes in the facilities available for visitation in the old jail, and we reverse that aspect of his injunction on the merits.
 
 2
 
 26
 Nor do we agree with the magistrate's conclusion that the County has violated the Equal Protection Clause because the visitation time allotted for male prisoners is one hour greater than that allotted for female prisoners. Over ninety percent of the inmates at the jail were male and no inmate, male or female, may be visited for more than fifteen minutes. Allotting greater time for the public to visit a greater percentage of the jail population justifies this assertedly differential treatment. See Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).
 
 3
 
 27
 The County does not seriously defend its policy of forbidding weekend visitation or of preventing visits by minors, but argues that the matters are moot because jail officials have voluntarily adopted rules that meet these demands of the inmates. We do not agree with the County that these matters are now moot, and are constrained to affirm the magistrate's declaration. When the magistrate ruled, the County had not yet modified its practices on weekend and minor visitation, and the changes that followed the ruling, while commendable, do not moot this case. City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982). Even had those policies been changed before the magistrate entered his orders, he would nevertheless have had the power to grant the inmates injunctive relief. It does not follow, however, that he should have granted more than declaratory relief. Our point is, as we will elaborate, that such a hair-trigger on federal injunctive power aimed at state government can be an abuse of discretion. It was here.
 
 IV
 
 28
 Use of federal injunctive relief as an, if not the, ultimate remedy for unconstitutional practices by state and local governments is now familiar. See generally O. Fiss, The Civil Rights Injunction (1978). While its familiarity to federal courts, gained particularly in desegregation cases over the past thirty years, gives an appearance of the ordinary to this extraordinary remedy, this familiarity in no way erodes the historic conceptual limits of injunctive relief. The malleable quality of the extraordinary injunction, with its ability to conform to complex facts, greatly enhanced its potency and fueled its popularity in civil rights cases. But the flexibility of the remedy only makes the more conspicuous its non-tailored use. That injunctive relief can be form fitted requires that it be exercised with full appreciation of the sensitive issues of federalism presented in cases of this ilk. As the Court explained in Rizzo v. Goode, 423 U.S. 362, 379, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976), "appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief."
 
 
 29
 [T]he principles of federalism which play such an important part in governing the relationship between federal courts and state governments, though initially expounded and perhaps entitled to their greatest weight in cases where it was sought to enjoin a criminal prosecution in progress, have not been limited either to that situation or indeed to a criminal proceeding itself. We think these principles likewise have applicability where injunctive relief is sought, not against the judicial branch of the state government, but against those in charge of an executive branch of an agency of state or local government....
 
 
 30
 Id. at 380, 96 S.Ct. at 608.
 
 
 31
 At the threshold, superintending federal injunctive decrees directing state officials are appropriate only when constitutional violations have been shown and when the state officials are demonstrably unlikely to implement the required changes without its spur. Where, as here, constitutional violations are found, but state officials have shown their readiness to meet constitutional requirements, the court should limit its initial response to a grant of declaratory relief.
 
 
 32
 There is no question but that the passive remedy of a declaratory judgment is far less intrusive into state functions than injunctive relief that affirmatively commands specific future behavior under the threat of the court's contempt powers. This reality underlay the passage of the Federal Declaratory Judgment Act, 28 U.S.C. Sec. 2201, expressly designed "to provide a milder alternative to the injunction remedy." Perez v. Ledesma, 401 U.S. 82, 111, 91 S.Ct. 674, 690, 27 L.Ed.2d 701 (1971) (Brennan, J., concurring and dissenting); id. at 112-13, 91 S.Ct. at 690-91 (discussing Act's legislative history). See Doran v. Salem Inn, Inc., 422 U.S. 922, 931, 95 S.Ct. 2561, 2567, 45 L.Ed.2d 648 (1975) (after successful suit against state defendant, "a district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary."); Grandco Corp. v. Rochford, 536 F.2d 197, 208 (7th Cir.1976) (vacating injunction against enforcement of statute, but affirming declaratory judgment of statute's unconstitutionality); see also Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (declaratory relief is not precluded in suits attacking threatened enforcement of state criminal laws, regardless of propriety of injunctive relief).
 
 
 33
 Our tolerance of declaratory relief and rejection of injunctive relief in this context is not at odds with the Supreme Court's holding that declaratory and injunctive relief are ordinarily equally inappropriate in cases where a state criminal prosecution is pending. Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971). In such circumstances declaratory relief, even if not as intrusive as an injunction, is intrusive enough. In Samuels, the Court observed that although a declaratory judgment would usually frustrate state criminal proceedings as much as an injunction, there might be "unusual circumstances" in which a declaratory judgment of a statute's unconstitutionality would be proper even if injunctive relief were not. Id. at 73, 91 S.Ct. at 768; see also Steffel, 415 U.S. at 472-73, 94 S.Ct. at 1222. Steffel and Samuels support the principle of Rizzo that primarily guides us here: that in all cases implicating state/federal relations, federal courts ought to intrude into state affairs no more than is absolutely necessary.
 
 
 34
 The county officials have demonstrated that superintending injunctive relief was not necessary. As we earlier explained, this suit was dormant for the first five years that it was pending. During that time this largely rural county constructed an entirely new facility designed to meet new state standards on jail conditions. Perhaps it is true, as the inmates suggest, that this suit was the brooding background which gave rise to the reform efforts of county officials, but it is also true that the new jail's construction was completed without the whip of a federal decree. Indeed, to the extent that the record is clear on the efforts of the jail's administrators to remedy the asserted violations, it indicates ready compliance rather than recalcitrance. Where, as here, the defendant makes dutiful progress to remedy the asserted problems, whether or not it is encouraged to do so by a suit, a federal court should exercise restraint. Any other course contradicts our system's principles of shared power.
 
 
 35
 In so holding, we do not tread on precedents that have upheld continued injunctive relief despite state defendants' protests of compliance. The Supreme Court and this court, when affirming such injunctions, have uniformly pointed to evidence of noncompliance or foot-dragging in the record below. See Allee v. Medrano, 416 U.S. 802, 815, 94 S.Ct. 2191, 2200, 40 L.Ed.2d 566 (1974) (injunction proper upon showing of "persistent pattern of police misconduct"); Jones v. Diamond, 636 F.2d 1364, 1375 (5th Cir.) (en banc), cert. dism'd, 453 U.S. 920, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981) (defendants' compliance came only after five years of "hotly contested" litigation, and only after oral argument of Fifth Circuit appeal; at time of trial, jail "still violated some constitutional requirements"); Gates v. Collier, 501 F.2d 1291, 1321 (5th Cir.1974) (continuing injunction proper where "protracted inhumane conditions and practices" had existed at penitentiary, "much [was] left to be done" to remedy those conditions, and federal monitor had been appointed based on inmates' complaints that state was not complying with court's orders). Such evidence of recalcitrance is absent from this record.
 
 
 36
 That principles of federalism compel the conclusion that superintending injunctions such as those issued here should be matters of the last order, not the first, is nothing new. We plow no new ground. The Supreme Court has recently told the Congress that it must state its intention in the statute itself if it is to exercise its power to abrogate Eleventh Amendment immunity; an intent to do so will not be inferred. Atascadero State Hospital v. Scanlon, --- U.S. ----, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). In other words, the judiciary has required that the Congress act in such a disciplined manner that intrusion into state affairs be its considered judgment and presumably a product of its felt necessity. It would be incongruous for the judiciary to not impose such discipline upon itself.
 
 V
 
 37
 We turn next to the jail's handling of the inmates' mail. Our task is hampered by the absence of specific findings on the asserted deficiencies in the County's program and by the opaque directive of the magistrate that:
 
 
 38
 Within sixty days defendant shall devise written guidelines applicable to mail practices which are consistent with Guajardo v. Estelle, 580 F.2d 748 (5th Cir.1978).
 
 
 39
 The magistrate concluded that "McLennan County's current policies regarding mail and censorship violate inmates' First Amendment rights," but made no specific findings that explained what he found deficient about those policies. As best we can tell, the problem was the absence of a provision for notifying inmates when their correspondence was confiscated and the absence of a right to appeal those decisions. But that is a speculation. We are forced to conclude that the findings are insufficient for review, especially given that the relief granted was no more than a directive that the County comply with the law. Accordingly, we vacate the magistrate's orders on the jail's mail policies and remand for factual findings.
 
 VI
 
 40
 In fashion parallel to his treatment of prisoner mail, the magistrate ordered jail officials to "institute disciplinary procedures consistent with Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)." The County does not seriously challenge the merits of the magistrate's findings that jail officials had violated Wolff in the past, but, as with its policies on visitation, asks us to vacate the injunction because it has been complied with.
 
 
 41
 As explained above in part IV, while compliance does not moot this issue, declaratory rather than injunctive relief was appropriate given that there was no recalcitrance on the part of County officials. The necessity for an injunction was never present and, in any event, the injunction issued has little operative effect beyond a grant of declaratory relief, save its own threat of the contempt power. For the reasons we set out in part IV, supra, we set it aside, while affirming the declaration as to past practices.
 
 VII
 
 42
 To summarize, we affirm the magistrate's declarations regarding access to the courts. We reverse his orders requiring changes in the visitation facilities at the old jail and those directing that visitation hours for male and female inmates be identical, but otherwise affirm the declarations concerning visitation policy. We vacate the orders regarding mail for lack of sufficient factual findings, and affirm those regarding disciplinary proceedings. We set aside all injunctive orders that accompanied the found deficiencies. Finally, we affirm the magistrate's decision that an award of attorney's fees is appropriate, but we vacate the award and remand for reassessment of its amount in light of our rulings. We express no opinion regarding the amount awarded. See Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (extent of plaintiff's success is a crucial factor in determining the proper amount of attorney's fees).
 
 
 43
 AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.