Henry MARANGE, Jr.,

v.

Huel FONTENOT.

No. 1:94–CV–76.

United States District Court,
E.D. Texas,
Beaumont Division.

March 16, 1995.

Jay Tantzen, Orange County, TX, for plaintiff.

Lauralee Vallon, Orange County Atty., for defendant.

### *OPINION*

HINES, United States Magistrate Judge.

Henry Marange, Jr., brings this action under 42 U.S.C. § 1983. Marange is incarcerated at the Texas Department of Criminal Justice, Institutional Division, Stevenson Unit. However, he complains of events which occurred when he was at the Orange County, Texas jail.

The sole defendant is Orange County's Sheriff, Huel Fontenot. Marange asserts Sheriff Fontenot violated Marange's constitutional right of access to courts by failing to provide an adequate law library.

This complaint is often heard by federal courts with heavy prisoner litigation dockets. Marange's claim, however, distinguishes itself in two respects. First, Marange sought a law library for use in *defense* of a pending *civil* tort action. He did not seek to present a constitutional claim, such as a civil rights complaint or a habeas corpus petition.

Second, Marange has no difficulty—as often is the case when inmates make "inadequate law library" claims—articulating a specific injury. Marange points to a $12.2 million default judgment entered against him while in Sheriff Fontenot's custody.

### I. MARANGE'S AUTOMOBILE CRASH

On April 17, 1992, plaintiff indulged in an excessive quantity of alcohol and then drove his car. He collided with another vehicle

driven by Kena Eaves. The Eaves vehicle carried Crystal Smith and her four children as passengers.

The crash killed Crystal, Jodie, Jr., age twelve, and Melinda, age five. Eaves and the two other Smith children, Jason and Misty, were hospitalized. The record before this court is devoid of evidence concerning the nature and extent of their injuries.

## II. CRIMINAL AND CIVIL PROCEEDINGS IN STATE COURT

In late July, 1992, Marange was indicted and charged with involuntary manslaughter. He read of his indictment in the newspaper and turned himself in to the Sheriff. He spent approximately two hours in the custody of the Orange County Sheriff's Office. He retained counsel and was admitted to bail. In May, 1993, pursuant to a plea bargain agreement, he pleaded guilty to three counts of involuntary manslaughter. He remained on bond until sentencing. On June 4, 1993, he was sentenced to ten years in the state penitentiary. He was placed in Sheriff Fontenot's custody at the Orange County Jail ("OCJ") to await transfer to prison.

While criminal prosecution of Marange did not begin for several months after the accident, civil litigation began almost immediately. Three weeks after the crash, Jodie Smith, natural father of Jodie, Jr. and Melinda, filed suit against Eaves and Marange on behalf of himself and the surviving siblings ("Smith plaintiffs"). Smith asserted negligence, wrongful death, and survival actions regarding Jodie, Jr. and Melinda.

On August 25, 1993, Ronny Sharp, Crystal's father, filed a separate suit against Eaves and Marange for Crystal's death.[1] The Sharp and Smith actions were consolidated on November 3, 1993.

Eaves cross-claimed against Marange for indemnification in the Smith civil suit a week before Marange was sentenced. She also sued Marange for injuries sustained in the crash. After Sharp's suit was filed, Eaves amended her cross-complaint to seek indemnification for any liability to Sharp.

The record concerning service of the petitions and cross-actions on Marange is unclear. In proposed findings of fact submitted in the case sub judice, both sides stated plaintiff was first served on May 8, 1992. However, Defendant's Exhibit 3b, at 1, reflects a return of service for Jodie Smith's petition on February 3, 1993. Plaintiff testified he remembered being served around May 24, 1993, almost immediately prior to his sentencing. In any event, there is no dispute that Marange was served with a civil action well before he was sentenced and entered Sheriff Fontenot's custody.

The only other evidence regarding service on Marange concerns Eaves amended cross-action. It was served on December 10, 1993, after Marange was incarcerated for six months. Indeed, so far as the record before the court reflects, all action in the state court civil cases occurred after Marange was sentenced and in custody except as already noted.

Five days after Marange was sentenced and incarcerated, he was deposed by the Smith plaintiffs' attorney. Eaves attorney also was present at this deposition. Marange was unrepresented by counsel. The present record does not contain Marange's deposition. However, Marange testified at trial in this action that he blamed Eaves, in part, for the crash.

Prior to incarceration, Marange never sought legal counsel regarding the pending civil lawsuits, although he was represented in the criminal matter by a retained attorney. He indicated at trial of this action that prior to being sentenced for the deaths of the Smiths, his civil liability was "the furthest thing from [his] mind."

Marange also never filed a formal answer to any of the causes of action asserted against him. On February 3, 1994—just five days before Marange was transferred from OCJ to the state prison—all parties to the civil litigation obtained default judgments

---

**1.** Smith was no longer Crystal's heir or a wrongful death beneficiary, pursuant to divorce. *See* TEX.PRAC. & REM.CODE ANN. 71.004 (Vernon 1986).

against Marange. The claimants were awarded $12,235,679.75 in compensatory damages, exemplary damages, and prejudgment interest. The judgment of the 163d Judicial District Court of Orange County, Texas, parsed out its awards as follows:

| Plaintiff | Awards | Total Award |
|---|---|---|
| Jason Smith | | |
| Actual Damages | $1,115,000.00 | |
| Interest | 204,714.00 | |
| Exemplary Damages | 1,000,000.00 | |
| | | $2,319,714.00 |
| Misty Smith | | |
| Actual Damages | 1,750,000.00 | |
| Interest | 321,300.00 | |
| Exemplary Damages | 1,000,000.00 | |
| | | 3,071,300.00 |
| Jodie Smith | | |
| Actual Damages | 2,000,000.00 | |
| Interest | 367,200.90 | |
| Exemplary Damages | 1,000,000.00 | |
| | | 3,367,200.00 |
| Ronny Sharp | | |
| Actual Damages | 500,000.00 | |
| Interest | 90,986.30 | |
| Exemplary Damages | 1,000,000.00 | |
| | | 1,590,986.30 |
| Kena Eaves | | |
| Actual Damages | 750,000.00 | |
| Interest | 136,479.45 | |
| Exemplary Damages | 1,000,000.00 | |
| | | 1,886,479.45 |
| Total Judgment | | 12,235,679.75 |

Marange also never appealed from the state court judgment. Instead, at the state prison he encountered inmates who assisted him in filing the present lawsuit.

### III. Marange's Legal Activities At Orange County Jail

While Marange ignored the civil suits prior to his incarceration, and never filed an answer after incarceration, he did not altogether sleep on his rights prior to entry of default judgment. On December 12, 1993 plaintiff submitted an Inmate Request form to a jail official identified in Plaintiff's Exhibit 2, at 71, only as "Mrs. Dumas." He wrote "I am writing to see how I would go about getting a state or court appointed attorney in a civil lawsuit...." Dumas's written response:

2. Judge Dunn presided over plaintiff's criminal action.

3. Plaintiff testified Officer Barlow regularly granted oral requests. In the absence of contrary testimony from Officer Barlow, who did not

You need to send a request to Judge Dunn [2] and let him know this is a civil law suit. The only alternative is the bar association but they only pick a few cases a month and that is for the whole county.

Plaintiff also wrote to Billye Minter, the District Clerk of Orange County, twice. He testified in this action that he sent his first letter within five days of service Sharp's complaint. This letter was unanswered. On January 25, 1994, he wrote again and requested information on how to proceed with the appointment of an attorney. His letter noted he had inquired of Ms. Minter regarding the earlier civil suit filed by the Smiths, but had not received an answer. Furthermore, this letter stated "I am not pleading guilty to any of this."

The letter to Ms. Minter and its envelope were returned to plaintiff at the jail. Across the front was scrawled, "Return. This is civil. Not entitled to a court appointed attorney." There was no signature on the note.

Finally, Marange attempted to obtain legal books. Before February 1994, OCJ inmates completed Inmate Request Forms for legal materials. The forms, which required a specific cite, were submitted to Officer Laura Barlow. Officer Barlow had no legal training, but acted as a librarian. If the book requested was available, Officer Barlow would bring it to the inmate; if not, she would either inform the inmate the book was permanently unobtainable or advise him to make another request in a few weeks.

Documentation of plaintiff's requests for legal books and advice from Barlow is sparse. Defendant asserts that Marange only asked for a lawbook once. Marange testified, however, that he made numerous requests, both oral and written, for general books "dealing with civil lawsuits and procedure." [3]

On the same day he wrote to Mrs. Dumas, plaintiff submitted a request for the Texas Penal Code. Barlow replied that she would

appear at trial but was listed in the joint final pre-trial order as both a plaintiff's and defendant's witness, the court accepts such contention as true.

"get a copy of the Penal Code to you." This apparently never occurred, because plaintiff received only one book in the course of his confinement at OCJ. This was the Texas Rules of Civil Procedure, and it was delivered the day after the default judgment was entered.

Marange made no formal request to jail officials to be "pulled" for a civil trial. He testified in this action that he assumed "Judge Dunn knew [he] was in the County Jail." The record is unclear as to whether Marange actually knew of the date scheduled for trial, and it appears he was laboring under the mistaken impression that Judge Dunn also was assigned to the civil action against him.

## IV. CONTENTIONS IN THE CASE SUB JUDICE

Marange claims Huel Fontenot impeded his constitutional right of court access by providing an inadequate law library. Marange does not argue he could have won his civil case. Instead, he contends he could have avoided a default judgment and mitigated damages levied against him had he been able to secure his presence at trial and otherwise fulfill his procedural obligations. Marange seeks a monetary award against Sheriff Fontenot in an amount sufficient to indemnify against Marange's liability to judgment creditors.

■ Defendant Fontenot denies his procedures for law library access by inmates are unconstitutional. Defendant claims plaintiff's formal requests for law library materials were honored. Defendant Fontenot alleges alternatively that plaintiff had no realistic opportunity to avoid liability and was therefore not prejudiced by any denial of court access. He argues plaintiff's guilty pleas effectively precluded his ability to avoid liability, even with constitutionally adequate access to the courts.[4]

Defendant Fontenot also asserts the defense of qualified immunity. This defense was not raised by specific motion to dismiss or for summary judgment. Therefore, there was no occasion for the court to address it until trial.

## V. ANALYSIS

Jurisdiction is proper in this case. 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343. Because the events giving rise to this suit occurred in Orange County, Texas, a county within the geographical boundaries of the Eastern District of Texas, venue is proper. See 28 U.S.C. § 1391. Pursuant to the consent of the ⋅parties and Title 28 U.S.C. § 636(c), the undersigned United States magistrate judge has authority to enter a final judgment.

### A. Elements of Cause of Action

■ To prevail in his access to court claim, plaintiff must satisfy two elements. First, he must show the law library system employed by OCJ at the time of his incarceration was constitutionally inadequate. Second, he must show defendant, under color of state law, caused him an actual injury. *Mann v. Smith*, 796 F.2d 79, 84 (5th Cir.1986) (*citing Hudson v. Robinson*, 678 F.2d 462, 466 & n. 5 (3rd Cir.1982)). Injury is composed of two prongs, causation and damages. *Ryland v. Shapiro*, 708 F.2d 967, 972 (5th Cir.1983).

### B. Identifying the Specific Constitutional Right ⋅

In addressing claims brought under Section 1983, analysis begins by identifying the specific constitutional right allegedly infringed by defendants. *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). This endeavor requires answering a question heretofore unresolved in this circuit.

#### 1. Prisoners Access To Courts—In General

■ Access to courts is protected by the First Amendment right to petition for redress of grievances and the Fourteenth Amendment guarantees of procedural and substantive due process. *Jackson v. Procunier*, 789 F.2d 307, 310 (5th Cir.1986). Pris-

---

**4.** Plaintiff pleaded guilty in the criminal disposition of his case. Under Texas law, his plea establishes negligence per se in the death of the Smiths. *Canales v. Bank of California*, 316 S.W.2d 314 (Tex.Civ.App.—Eastland 1958, writ ref. n.r.e.). His plea therefore constituted an admission in the civil liability trial. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 312 (Tex.1987).

oners retain their constitutional right to court access, and that access must be adequate, effective, and meaningful. *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). "The fundamental constitutional right to access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 828, 97 S.Ct. at 1498. This right can be satisfied either through appointed counsel, access to a law library, or access to legally trained paraprofessionals. *Id.* at 830–31, 97 S.Ct. at 1499–1500.

County jails are not exempt from the provision of law library access. *See Hooten v. Jenne*, 786 F.2d 692 (5th Cir.1986); *Morrow v. Harwell*, 768 F.2d 619 (5th Cir.1985); *Cruz v. Hauck*, 515 F.2d 322, 332 (5th Cir. 1975). Those incarcerated in county jails for a period of time sufficient to petition the courts are entitled to *Bounds* access. *Hooten*, 786 F.2d at 697.

Plaintiff in this action was confined to OCJ from June 1993 to February 1994. This is a period of time sufficient to trigger his right to court access. *See Morrow*, 768 F.2d at 624 (ninety days may be appropriate benchmark for triggering right to court access).

## 2. Adequate Law Library

Prison and jail officials who elect to furnish access to courts *via* the law library option must provide "adequate, effective and meaningful" libraries, coupled with reasonable opportunity for their use. *Ruiz v. Estelle*, 679 F.2d 1115, 1153 (5th Cir.1982), *vacated in part on other grounds*, 688 F.2d 266, *cert. denied*, 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). Procedures like those employed by Sheriff Fontenot at the Orange County Jail have been described as a "bookmobile" system. It is well established in this circuit that a "bookmobile" system is a constitutionally impermissible method of providing prisoners with court access. *Green v. Ferrell*, 801 F.2d 765 (5th Cir.1986); *Morrow*, 768 F.2d at 623.

We hold that the bookmobile checkout system, accompanied by circumscribed assistance from law students, does not meet the *Bounds* requirement. In the absence of some sort of direct legal assistance, which need not be by trained lawyers, the inmates must be given access to a library as required in *Bounds*. That access is not met by a system allowing a prisoner to check out books though a weekly bookmobile. The Federal Supplement, the Federal Reporter, and the Supreme Court Reporter today consist of a total of approximately fifteen hundred volumes. Even a quick research project by a trained lawyer may require reference and cross reference to numerous volumes. Such a task would be impossible to complete with no legal assistance and only the limited library program presently in place.

*Morrow*, 768 F.2d at 623.

The OCJ system, therefore, was constitutionally inadequate at the time of plaintiff's confinement.

### 3. Was Marange Entitled to *Bounds* Access?

The question remains, however, whether Marange was entitled to *Bounds* access for the specific purpose of defending a civil action. "*Bounds* is vague about exactly what kinds of claims by inmates trigger the 'right of access' to the courts, how long a person must be detained before the right is triggered, and what level of legal assistance is required to protect the right." *Mann v. Smith*, 796 F.2d 79, 84 (5th Cir.1986). The amorphous quality of this right, which continues to require considerable judicial inquiry and resolution, has been attributed to its lack of a concrete textual basis within the Constitution. *Id.*

The specific issue here is in serious doubt because the Fifth Circuit has stated that a prisoner's right of adequate and meaningful access to the courts does *not* include the right to *all* legal filings, but applies instead only to presentation of constitutional claims, such as civil rights complaints and habeas corpus petitions. *Morrow*, 768 F.2d at 623.

*Morrow* doesn't end the inquiry, however, because its statement is *obiter dic-*

*tum.*[5] As such, it does not constitute binding circuit precedent,[6] and must be considered afresh in light of its persuasiveness, well-reasoned rationale, and adherence of the authoring court to its own guideline. *See* Michael C. Dorf, *Dicta & Article III*, 142 U.PA. L.REV. 1997 (1993). If a court considering dicta finds it unpersuasive, premised on ill-reasoned rationale, or contrary to weight of other authority, it may follow its own judgment in the matter.

 *Morrow* doesn't elaborate on why the constitutional right of access to the courts is deemed limited to presentation of constitutional claims. Therefore, this court only can speculate as to the *Morrow* court's rationale. Perhaps the statement at issue is premised on the notion while Due Process and the Eighth Amendment compel *Bounds* access in order to present constitutional challenges to the fact or duration of confinement (habeas corpus) and to conditions of confinement (civil rights), requiring more would elevate prisoners above their free-world counterparts. Government officials, of course, have no duty to provide lawyers, trained paraprofessionals or adequate law libraries to unincarcerated citizens in general civil litigation.

While this hypothesized rationale has some superficial appeal, it ultimately is unavailing. The same argument could be advanced with respect to routine, non-emergent health care, food, clothing, and recreation. Clearly, prison and jail officials cannot avoid these responsibilities by arguing that state and local governments are not obligated to provide the same services to unincarcerated citizens.

The court, therefore, must examine other factors. First, the right to defend oneself in a civil suit has been the topic of judicial discussion well before articulation of the right to court access. In *Chambers v. Baltimore & Ohio Railroad Co.*, 207 U.S. 142, 148, 28 S.Ct. 34, 35, 52 L.Ed. 143 (1907), the Supreme Court declared that "[t]he right to sue and defend in the courts is the alternative of force."

Second, the United States Supreme Court has not circumscribed prisoner court access in the manner described in *Morrow*. Nothing in *Bounds* limits prisoners' rights to presenting constitutional claims. Instead, *Bounds* holds "[t]he fundamental constitutional right to access to the courts requires prison authorities to assist inmates in the *preparation and filing of meaningful legal papers* by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498 (emphasis added). Thus, the Supreme Court did not narrowly define the right to sue affirmatively, but used the generic term "preparation and filing," not "presentation."

Third, other Fifth Circuit decisions cast doubt on the viability of *Morrow*'s statement. In the same year as *Bounds*, the Fifth Circuit held that "reasonable access to the courts must include access to general civil legal matters, including but not limited to divorce and small claims." *Corpus v. Estelle*, 551 F.2d 68, 70 (5th Cir.1977).

Less than a year after *Morrow*, the Court of Appeals brushed aside its implications and wrote:

> As we have recently said, obiter dicta, in *Morrow v. Harwell*, the *Bounds* opinion was primarily concerned with constitutional and civil rights claims. Recognition of the constitutional rights of access to the court, however, long precedes *Bounds* and has from its inception been applied to civil as well as constitutional claims.
>
> . . . . .
>
> [A]lthough *Bounds* does not discuss civil suits, neither that opinion nor our dicta in *Morrow*, undermines our previously recognized right of access to courts in civil matters.

*Jackson v. Procunier*, 789 F.2d at 311.

Fourth, *Morrow*'s dicta contradicts a direct holding of a sister circuit. In *Straub v.

---

5. Dictum is an expression of judicial opinion about the way the law would be applied to facts not before the court. *United States v. Reed*, 810 F.Supp. 1078, 1080 n. 3 (D.Alaska 1992), *aff'd*, 15 F.3d 928 (9th Cir.1994).

6. The U.S. Constitution precludes decision of issues outside a "case or controversy." *See* U.S. CONST. art. III. Thus, dicta does not bind other courts as precedent.

*Monge,* 815 F.2d 1467 (11th Cir.1987), the Eleventh Circuit held that the state may not bar court access by an inmate seeking to defend against a civil forfeiture action. That court reasoned that *Morrow's* dicta has been implicitly rejected by its own circuit with the issuance of *Jackson v. Procunier. Id.* at 1470.

Fifth, no valid public policy compels limitation of court access in the manner described by *Morrow.* While pro se, *in forma pauperis* lawsuit abuse by inmates is notorious, defending oneself in civil action is not subject to the type of litigant abuse so frequently evidenced in prisoners' petitions for redress of grievances. It is unlikely that even recreational inmate litigators would choose to voluntarily subject themselves to the agonizing voyage of the civil defendant.

Ironically, *Morrow's* approach might serve only to increase prisoner litigation. There now exists a growing trend toward monetary compensation of violent crime survivors. New legislative initiatives often contain provisions that create new civil causes of action against criminals.[7] As our overburdened criminal justice system often fails to redress the totality of harm perpetrated upon innocent persons, the civil liability system expands to fill the gaps. If the victim of crime is entitled to a day in civil court, surely a civil defendant should be able to meet the allegations. Entry of default judgments in every civil action against imprisoned defendants only would flood state and federal courts with requests for post-judgment relief.

Consideration of the enumerated factors causes this court to conclude that *Morrow's* dicta is unpersuasive. Rather, the court's analysis leads inexorably to the conclusion that a prisoner's First and Fourteenth Amendment rights to court access extends to legal activities in defending against civil actions. Since the only access afforded Mar-

ange was a constitutionally infirm "bookmobile" system, the court further concludes that Marange's right of court access was infringed.

### C. Waiver

■ The court next considers whether Marange waived his right to *Bounds* access. Marange was served with civil process before coming into Sheriff Fontenot's custody. Under the trial record, he had between four and thirteen months liberty after being served during which time he did nothing to answer or otherwise defend himself. Certainly, this failure to protect his legal position has a bearing on Marange's credibility when asserting that Sheriff Fontenot's deficient law library procedure caused Marange to be cast in judgment for over twelve million dollars by default. Similarly, the evidence that Marange did nothing to seek a new trial or timely appeal the default judgment after he obtained access to the state prison's law library, adversely affects his contention that defendant is wholly at fault.

Nevertheless, it is uncontroverted that *before* Eaves, Sharp, and the Smith plaintiffs moved for default judgment, Marange became incarcerated. The default judgment was not entered until Marange had been incarcerated for eight months. Had Marange filed an answer at anytime before entry of default judgment, the judgment would not have been entered. *See* TEX.R.CIV.PROC. 239; *Davis v. Jefferies,* 764 S.W.2d 559, 560 (Tex.1989).

Once incarcerated, Marange made reasonable and timely lay attempts to defend himself. Under these circumstances, the court cannot conclude he waived his right to *Bounds* access.

### D. Defendant Fontenot's Immunity

Having concluded that Marange had an unwaived, infringed, constitutional right of

---

7. *See, e.g.,* Kady McMaster, *Victim's Option of Suing Attackers in Federal Court Seen as Symbolic,* STAR (Kansas City), Sept. 6, 1994, at A9 (reporting on the 1994 crime bill approved by Congress, which gives rape victims the right to sue their attackers in court regardless of whether criminal charges are levied); Ruth Pillar, *Civil Rape Trials Can Give Victims Chance to be Heard,* CHRONICLE (Houston), Nov. 16, 1992, at A13 (comparing the standards of proof in criminal

and civil actions and noting the benefits to victims who pursue civil cases in conjunction with or alternative to criminal prosecutions); Lorraine Woellert, *Whose Rights Come First?,* WASH. TIMES, Nov. 7, 1994 at C4 (reporting of the proposed amendment to the Virginia State Constitution which, if adopted, would allow the state's General Assembly to extend statutes of limitations for suits seeking damages for intentional torts to children).

686

688

*Bounds* access to an adequate law library in order to defend against a civil action, the court now turns to Sheriff Fontenot's qualified immunity defense.

### 1. Qualified Immunity

■ The qualified immunity doctrine may be summarized thus: "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396, 411 (1982). *See also Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Chrissy F. v. Mississippi Dep't of Public Welfare,* 925 F.2d 844, 848 (5th Cir.1991); *Jacquez v. Procunier,* 801 F.2d 789, 792 (5th Cir.1986); *Elliott v. Perez,* 751 F.2d 1472 (5th Cir.1985).

■ When considering a claim of qualified immunity, courts engage in a bifurcated analysis. First, courts determine whether plaintiff has alleged the violation of a clearly established constitutional right. If so, courts then determine whether the plaintiff has alleged defendant's conduct was not objectively reasonable. *Rankin v. Klevenhagen,* 5 F.3d 103 (5th Cir.1993). An official's conduct is not protected by qualified immunity if, in light of preexisting law, it was apparent that the conduct, when undertaken, constituted a violation of the right at issue. *Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 455 (5th Cir.1994). A right is clearly established only when its contours are sufficiently clear that a reasonable official would have realized that his or her conduct was otherwise improper. *Id.*

### 2. Was Sheriff Fontenot's Conduct Protected By Qualified Immunity?

■ The general right of access to courts by inmates was clearly established at the time of Sheriff Fontenot's challenged conduct.[8] Similarly, the Fifth Circuit had affirmatively declared the "bookmobile checkout

system" constitutionally infirm during the relevant time.[9] However, particularity as to the right allegedly violated must be clear:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he [sic] is doing violates that right.... [I]t is to say that in light of preexisting law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).

As a reasonable official, Sheriff Fontenot would not have understood that denying an inmate civil *defendant* access to an adequate law library violated clearly established law. As the above quotation instructs, the "contours of the right" must be sufficiently clear that Sheriff Fontenot would understand his conduct was unlawful. This means that Sheriff Fontenot is unprotected if a reasonable official would have understood that denying access to an adequate law library to an inmate sued as a defendant in a general civil suit was unlawful. Such conclusion is unwarranted because the most direct statement of the Fifth Circuit suggests otherwise. *See Morrow* 768 F.2d at 623. While *Morrow* has received critical comment, it has not been specifically rejected. Furthermore, the Fifth Circuit's most recent mention of *Morrow* is in support of the notion that "the precise contours of a prisoner's right of access to the court remain somewhat obscure." *Brewer v. Wilkinson,* 3 F.3d 816, 821 (5th Cir.1993).

In short, it cannot be said that in the period of Marange's incarceration at the Orange County Jail, there was any "general, well-developed legal principle[ ]" that would cause a reasonable jail official to know he was violating Marange's rights by failing to provide an adequate law library for use in defending a civil tort action. For this reason, Sheriff Fontenot's qualified immunity defense is sustained.

### E. Is Orange County Liable?

■ Initially, sua sponte consideration by this court of Orange County's possible liability seems most questionable. As mentioned at the outset, the sole defendant is Sheriff

8. *See* discussion at Section V., A.1. *infra.*

9. *See* discussion above at Section V., A.2, *infra.*

Fontenot. Sheriff Fontenot undoubtedly is the county's agent, but suit against him individually is not suit against the county. Moreover, the county has no respondeat superior liability for the sheriff's actions. *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 692, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978).

■ Nevertheless, two factors compel analysis of potential county liability. First, circuit authority establishes that in suits against local *officials*, local *governments* may themselves be made liable to the plaintiffs, even when they are not formally parties in the suit, as long as the suits are against officials in their official capacities, and as long as public entities received adequate notice and an opportunity to respond. *Barrett v. Thomas*, 809 F.2d 1151, 1155 (5th Cir. 1987); *Barrett v. Thomas*, 649 F.2d 1193, 1201 (5th Cir.1981). Second, a municipality is not entitled to claim the qualified immunity that its agents can assert. *Owen v. City of Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980).

If the county is liable for Sheriff Fontenot's constitutionally deficient inmate-access-to-court procedures, and if the county is unshielded by qualified immunity, then the court must consider further whether Marange has proven the remaining elements of his Section 1983 claim, *viz.*, legal cause and damages. Otherwise, the analysis ends here.

Orange County received adequate notice of Marange's suit. This is evident from the fact that Orange County's elected attorney defended the suit from its inception. Moreover, Orange County had ample opportunity to move to intervene and respond to Marange's allegations.

■ The determinative issue, then, is whether Marange brought suit against Sheriff Fontenot in his official capacity. Marange's pleadings fail to clearly specify whether he sued Sheriff Fontenot personally, in his official capacity, or both. Thus, the "course of proceedings" must be examined as to the nature of the liability sought to be imposed. *See Brandon v. Holt*, 469 U.S. 464, 469, 105 S.Ct. 873, 877, 83 L.Ed.2d 878 (1985).

Once again, there are no easy clues. However, such indicia as the undersigned deems relevant lead to the conclusion that Marange's claim was a personal-capacity action rather than an official-capacity suit. Nothing in Marange's pleadings, the pretrial order, the evidence, closing arguments or proposed findings of fact and conclusions of law focus on anything other than whether Sheriff Fontenot, acting under color of state law, caused deprivation of a federal right. More is required in an official-capacity action. *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). It must be shown that the governmental entity itself is a moving force behind the deprivation. *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981).

■ In an official-capacity suit, the governmental entity's official policy or custom takes center stage. Official policy must have played a part in the violation of federal law. *Oklahoma City v. Tuttle*, 471 U.S. 808, 817–18, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985). Further, in an official-capacity action, absolute and qualified immunity defenses are unavailable. *See Brandon*, 469 U.S. at 469, 105 S.Ct. at 876; *Owen*, 445 U.S. at 638, 100 S.Ct. at 1409. The only immunities which can be claimed in an official-capacity action are forms of sovereign immunity. *Kentucky v. Graham*, 473 U.S. at 167, 105 S.Ct. at 3106.

■ To be sure, municipal policy or custom can be established by a single act of an individual official to whom policy-making authority has been delegated. *See, e.g., City of St. Louis v. Praprotnik*, 485 U.S. 112, 122, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988); *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981); *Owen*, 445 U.S. at 638, 100 S.Ct. at 1409. Undoubtedly, Sheriff Fontenot, like most Texas sheriffs, had wide-ranging discretion in the operation of the Orange County Jail. TEX.LOC. GOV'T.CODE ANN. § 351.041(a) (Vernon 1988) ("The Sheriff of each county is the keeper of the county jail.") It might be that Sheriff Fontenot could be shown to be the sole maker of official jail policy. However, the trial did not focus on Orange County policy, nor Sheriff Fontenot's status as policy

maker. It focused instead on his alleged abuse of governmental power as sheriff.

Marange's suit is a personal-capacity action. It follows that Orange County is not liable for acts of Sheriff Fontenot.

### F. Causation and Damages

The conclusions above pretermit recovery by Marange. Therefore, no need exists to consider Marange's evidence of causation and damages. It may be appropriate, however, to make alternative findings regarding these issues.

Marange satisfied his burden of proving the constitutional deprivation was a proximate cause of injury. He clearly tried to respond before the default judgment by inquiring of a jail official as to how he might secure appointed counsel, by writing the District Clerk twice, and by advising he was "not pleading guilty to this." Had he received *Bounds* access, the court is persuaded he would have succeeded in filing an answer sufficient to preclude entry of a default judgment. To be sure, Marange likely would have been found liable in any event.[10] But in a contested, adversary proceeding, even his pro se defenses and arguments on damages would have been of some benefit to him.

Marange's proof of damages presents a more difficult challenge. The court is not hesitant to conclude that in an adversary proceeding, amounts assessed against Marange might have been less than twelve million dollars. Texas law narrowly circumscribes damages recoverable in survival actions, particularly when death was instantaneous.[11] While recoverable elements of damages are broader in Texas wrongful death actions,[12] as a practical matter, statutory beneficiaries' proof of substantial damages for death of adult or minor children is difficult. *See City of Austin v. Cooksey*, 570 S.W.2d 386 (Tex.1978).

The factors enumerated above lead one to suspect that the default judgment awards are highly inflated. However, this is speculation. No evidence was presented at trial to quantify how much the awards would have been decreased had Marange been able to mount a defense, request a jury, or otherwise attack the contentions of the plaintiffs.[13] As it is plaintiff's burden to prove damages by a preponderance of the evidence, his Section 1983 action essentially would fail at this juncture, even had he succeeded in imposing liability on Sheriff Fontenot or Orange County.[14]

### G. Conclusion

This opinion serves as the court's findings of fact and conclusions of law. Final judgment shall be entered in accordance with this opinion.

Because the court awards no damages against the named defendant or otherwise, plaintiff does not appear to be a "prevailing party" entitled to attorney's fees under 42 U.S.C. § 1988. *See Farrar v. Hobby*, — U.S. —, —, 113 S.Ct. 566, 573, 121 L.Ed.2d 494 (1992). Plaintiff's efforts were not wholly unavailing, however. Plaintiff succeeded in obtaining a declaration that a prisoner's right of access to courts includes the right to *Bounds* assistance in defense of a civil claim. This could prove significant for

---

10. *See El Chico Corp.*, 732 S.W.2d at 312; *Canales*, 316 S.W.2d at 316.

11. The only elements of damages recoverable in a survival claim include the decedent's conscious pain, suffering and mental anguish, medical expenses, and/or funeral and burial expenses. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 71.021 (Vernon 1986); 3 Texas Pattern Jury Charges 82.02 (3d ed. 1990).

12. The elements of damages recoverable in a wrongful death action include pecuniary losses, defined as the "loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value, including loss of inheritance," 3 Texas Pattern Jury Charges 81–4, loss of companionship and society, and mental anguish. *See* TEX.CIV.PRAC. & REM. CODE ANN. §§ 71.001–71.011 (Vernon 1986).

13. At trial of this action, plaintiff expressed doubt as to what his mitigation arguments might be. However, plaintiff had at least an arguable basis for mitigation because Sharp's civil action alleged Eaves also had been drinking immediately prior to the accident.

14. Under the hypothesized facts, Marange would be entitled to receive nominal damages not to exceed one dollar. *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 308, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986).

other inmates as future victims' rights lawsuits increase.

If plaintiff's counsel believes the court can award attorney's fees under these circumstances, the court invites a motion. Otherwise, this opinion concludes by expressing the court's appreciation to Jay Tantzen, Esq. In accepting the court's appointment as *pro bono* counsel for plaintiff, counsel fulfilled the ideal envisioned by Congress when it passed legislation allowing attorney's fee awards: to permit plaintiffs with potentially meritorious civil rights claims to obtain legal assistance otherwise unavailable to them.

### FINAL JUDGMENT

This action having been tried before the court on September 12, 1994, and a decision having been duly rendered, it is hereby

**ORDERED** and **ADJUDGED** that plaintiff take nothing, and this lawsuit is **DISMISSED** with prejudice. Costs shall be borne by the party incurring such.

All motions by either party not previously ruled on are hereby **DENIED.**