IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-10316
Summary Calendar
_____


DANNY RAY EASON,

Plaintiff-Appellant,

versus

WARDEN THALER, ET AL.,

Defendants-Appellees.


_____

Appeal from the United States District Court for the
Northern District of Texas
_____
January 17, 1996

Before GARWOOD, WIENER and PARKER, Circuit Judges.[*]

PER CURIAM:

Plaintiff-appellant Danny Ray Eason (Eason), an inmate confined in the Texas Department of Criminal Justice-Institutional Division (TDCJ), brought this suit against five TDCJ officials pursuant to 42 U.S.C. Section 1983 alleging violations of his civil rights. Eason appeals the district court's grant of summary judgment for the defendants-appellees.

_____

[*]     Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

**Facts and Procedural Background**

Eason's claims can be traced to a disturbance that occurred at TDCJ's Preston E. Smith Unit (Smith Unit), where Eason was confined, on November 12, 1992. Sometime in the evening on that date, a potentially explosive situation developed in the recreation yard of the Smith Unit. Large groups of African-American and Hispanic inmates became hostile towards one another, and prison officials averted a dangerous situation by quickly segregating the Hispanic and African-American inmates and moving all of the prisoners, in stages, back into their cells. During this episode in the yard, Eason—apparently an African-American—had been in the Smith Unit's recreation room. He and the other prisoners in the recreation room were likewise directed to return to their respective wings, and subsequently to their cells. Warden Richard Thaler, who was senior warden at the Smith Unit on November 12, 1992, contacted the TDCJ regional director's office and it was determined that several buildings of the unit should be immediately "locked-down" pending an investigation into this disturbance. During the lockdown, the impacted inmates were essentially confined to their cells. The wing of the building in which Eason was housed remained on lockdown until December 7, 1992, for a duration of approximately twenty-six days. Because the inmates were not permitted to leave their cells—except for periodic showers—meals, library books, medical assistance and all other necessities and services had to be brought to the inmates' cells. Eason's claims

arise out of this lockdown and events which occurred during the twenty-six day period.

Eason filed this action under 42 U.S.C. Section 1983 in the United States District Court for the Northern District of Texas, Lubbock Division. The district court dismissed Eason's claims pursuant to 28 U.S.C. Section 1915(d). In *Eason v. Thaler*, 14 F.3d 8 (5th Cir. 1994), this Court vacated the district court's judgment, finding that Eason's section 1983 claims might not have been frivolous if he had been given the opportunity to develop these claims through the use of a questionnaire or a hearing (*Spears* hearing) as provided for in *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985). On remand, the district court required Eason to answer a questionnaire and held a *Spears* hearing so that he might develop the facts related to his claims. The parties filed cross-motions for summary judgment, and, in accordance with the district court's order, they also filed post-*Spears* hearing summaries of the facts and their arguments. On March 16, 1995, United States Magistrate Judge J.Q. Warnick, Jr. entered his findings, conclusions and recommendation (Magistrate's findings) based on all of the evidence. Expressly adopting the Magistrate's findings, the district court granted summary judgment for the defendants and dismissed Eason's complaint with prejudice on March 24, 1995.

Eason filed a timely notice of appeal.

## Discussion

We review the district court's grant of summary judgment de novo. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.) (citing *International Shortstop, Inc. v. Rally's*, 939 F.2d 1257, 1263 (5th Cir. 1991)), *cert. denied*, 113 S.Ct. 82 (1992). Summary judgment is proper if the moving party demonstrates the absence of a genuine issue of material fact, a showing which entitles the movant to summary judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505, 2506-2514 (1986). If the movant produces evidence tending to show that there is no genuine issue of material fact, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2552 (1986). In this analysis, we review the facts and draw all inferences most favorable to the nonmovant. *Herrera v. Millsap*, 862 F.2d 1157, 1159 (5th Cir. 1989). However, mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment. *Topalian*, 954 F.2d at 1131.

In his first point of error, Eason contends that his constitutional rights were violated when he was placed on lockdown without notice or an opportunity to be heard. Eason cites the Supreme Court's decision in *Hewitt v. Helms*, 103 S.Ct. 864 (1983), in support of this contention. *Hewitt* involved the segregation of

4

a Pennsylvania state prisoner from the general prison population during the investigation into his role in a prison riot. The Court held that, "It is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." *Id.* at 869. The Court further concluded that such "administrative segregation" in the prison context—segregation "used to protect the prisoner's safety, to protect other inmates from a particular prisoner, to break up potentially disruptive groups of inmates, or simply to await later classification or transfer"—did not implicate an interest independently protected by the Due Process Clause. *Id.* at 869-870. However, after examining the Pennsylvania statutes and regulations governing the administration of state prisons, the Court found that Pennsylvania had gone beyond the creation of simple procedural guidelines; instead, the Pennsylvania regulations used language "of an unmistakably mandatory character", prohibiting the employment of administrative segregation absent specific circumstances. *Id.* at 871. The Court held that Pennsylvania had vested in Helms a state-created liberty interest in remaining in the general prison population, thereby affording Helms the minimum protections of the Due Process Clause. *Id.*

Recently, however, the Supreme Court has reconsidered the step it took in *Hewitt*, observing that "the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected

5

by the Due Process Clause." *Sandin v. Conner*, 115 S.Ct. 2293, 2300 (1995). In *Sandin*, the Supreme Court considered a state inmate's due process challenge to his punitive segregation from the general prison population, and concluded:

> "The time has come to return to the due process principles we believe were correctly established and applied in [*Wolff v. McDonnell*, 94 S.Ct. 2963 (1974)] and [*Meachum v. Fano*, 96 S.Ct. 2532 (1976)]. Following *Wolff*, we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* (internal citations omitted).

In this case, however, we do not reach the impact of *Sandin* on the methodology, developed in *Hewitt* and its progeny, for finding a state-created liberty interest.[1] Eason has failed to identify a single statute, regulation or even internal TDCJ policy directive as evidence of a state-created liberty interest in the present case. Instead, Eason suggested at his *Spears* hearing that he was entitled to official notice of the reasons for, and expected duration of, the lockdown, and that he had not received such

---

[1] We note, however, our observation in *Orellana v. Kyle*, No. 95-50252, slip op. (5th Cir. Aug. 11, 1995), that:

> "Although *Sandin* cites with approval cases in which it was held that state law could create a constitutional liberty interest in good-time credits, or release on parole, it is difficult to see that any other deprivations in the prison context, short of those that clearly impinge on the duration of confinement, will hence-forth qualify for constitutional 'liberty' status." *Id.* at 5952-5953 (internal citations and footnote omitted).

6

notice. In an effort to substantiate this assertion, Eason asked Warden Richard Thaler (Thaler) about this purported requirement of formal notice. Thaler replied that there was no such requirement under TDCJ regulations or policy, and that any progressive schedule distributed—by word of mouth or otherwise—to the inmates during a lockdown represented nothing more than a voluntary effort on the part of prison officials to provide incentive for cooperation between officials and inmates. Eason likewise failed to produce any evidence in support of his contention that it was TDCJ policy to collect the identification cards of prisoners involved in a disturbance so as to limit lockdown status to only those inmates who had been involved in the disturbance. In sum, there is an absence of <u>any</u> evidence of a state-created liberty interest protected under the Due Process Clause in the present case.

After conducting the *Spears* hearing in this case, the magistrate judge concluded that Eason's due process rights had not been violated. First, the magistrate judge found no evidence to indicate that Eason's segregation from the general prison population constituted punishment; this established, the defendant-prison officials did not violate Eason's constitutional rights by the lockdown. *Wilson v. Seiter*, 111 S.Ct. 2321 (1991); *Mitchell v. Sheriff's Department, Lubbock County*, *Texas*, 995 F.2d 60 (5th Cir. 1993). Second, the magistrate found that the lockdown was instituted so as to protect the security and integrity of the prison unit, and to protect the prisoners from each other, pending completion of the investigation into the November 12, 1992

7

disturbance. The magistrate judge noted the Supreme Court's conclusion that procedural safeguards required by the Constitution are relaxed with regard to prison lockdowns when the welfare and security of an entire prison, or any part thereof, are threatened. *Hewitt*, 103 S.Ct. at 473-475.

We find that, while Eason has alleged in a conclusory manner that the lockdown was imposed for punitive reasons, he failed to offer evidence that the lockdown was instituted out of any concerns other than safety and prison security. Additionally, we find that racial tension was at a high level as a result of the confrontation between African-American and Hispanic inmates on November 12, and that this hostility among inmates, and also between inmates and correctional officers, resulted in the lockdown of Eason's wing of J-1 Building of the Smith Unit pending an investigation into the causes of the disturbance. We further find that Eason has produced no evidence that the lockdown violated TDCJ regulations or any Texas statute. Even accepting as true Eason's assertions that he was innocent of any involvement in the November 12 disturbance, Eason has raised no issue of fact which would require trial on the merits of his due process claim.

In his second point of error, Eason alleges that he was deprived of his constitutional right to nutritionally adequate meals during the lockdown because numerous meals contained pork, which he, as a Muslim, could not eat. To comply with the Constitution, inmates must receive "reasonably adequate" food. *George v. King*, 837 F.2d 705, 707 (5th Cir. 1988) (citations

8

omitted). Additionally, inmates retain the constitutional right to practice their religious beliefs; "Restrictions thereon must be reasonably related to legitimate penological interests." *Muhammad v. Lynaugh*, 966 F.2d 901, 902 (5th Cir. 1992) (footnote omitted).

We find that Eason failed to offer any evidence that the meals he received during this twenty-six day lockdown were nutritionally or otherwise constitutionally inadequate or improper. At the *Spears* hearing, Eason asserted that he received only three hot meals during the lockdown period, "one on one day and two on that Friday [preceding the conclusion of the lockdown]." Eason further testified that, in the twenty-six evening "johnny sack" meals, every sack contained one peanut butter biscuit, and the second sandwich in approximately ten of these twenty-six evening meals featured a meat other than pork. Eason also alleged that the guards delivering the johnny sacks would defile the contents of these meals, spitting on sandwiches and kicking these sacks across the floor; in the course of this lockdown period, Eason contends that he lost twenty-six pounds. Of these assertions, only his testimony pertaining to the maltreatment of food has any arguably direct bearing on his constitutional claim. However, it is clear from Eason's *Spears* hearing testimony that none of the named defendants are alleged to have participated in this misconduct. Neither does Eason's testimony piece together even a claim of deliberate indifference on the part of any one of the named defendants. Eason's appellate briefs offer no help in identifying the focus of his allegations in this respect because Eason fails to

9

explain how any of the defendants participated in or sanctioned this purported misconduct. There is no respondeat superior liability under section 1983. Therefore, we find that Eason has produced no evidence sufficient to raise a genuine issue of material fact regarding the liability of the defendants respecting the nutritional adequacy of his meals during the lockdown.

In support of his claim that the inclusion of pork in his meals infringed upon his constitutional right to practice his religious beliefs, Eason attempted to produce evidence that the defendants knew or had reason to know that he was a practicing Muslim, and that they nevertheless ignored the dietary mandates of his religion. Eason's allegations in this regard are two-pronged. First, he maintains that the appropriate officials at the Smith Unit should have been aware of his religious affiliations because officials at TDCJ's William P. Hobby Unit (Hobby Unit), his previous place of incarceration, were aware of, and acted in accordance with, his Muslim beliefs. Second, Eason implies that he made his religious orientation known to the appropriate persons in the Smith Unit. With regard to his first contention, Eason produced no evidence that his "travel card" indicated that he was a Muslim prior to December of 1993, long after the lockdown in question. Nor did he bring forward any evidence that officials in the Smith Unit, presumably the defendants, should have been aware of the religious identification he established while incarcerated at the Hobby Unit on the basis of any other sources of information. Until December of 1993, Eason's travel card indicated that he was

10

a Baptist, and the Smith Unit officials in a position to accommodate his religious affiliation—and corresponding dietary needs—had no reason to believe otherwise.[2] As to Eason's implied second contention, that he informed the appropriate prison officials at the Smith Unit of his religious orientation prior to the lockdown, we find that Eason introduced no evidence to substantiate this claim. Eason asserts that, prior to the lockdown, he approached "the doctor" at the Smith Unit for a dietary card entitling him to pork-free meals. He testified that this doctor denied the request because he had no medical reason for such a dietary restriction. Eason further intimated at the *Spears* hearing that he made his religious ties known to Sergeant Robert Buckley, one of the defendants, during the lockdown. However, Eason also conceded his understanding, at the time he spoke with the Smith Unit doctor, that he would need to inform the kitchen captain or the warden in order to obtain a pork free diet. Warden Thaler clarified that Eason should have spoken with the chaplain in order to be placed on the list of Muslim inmates at Smith Unit; it was by speaking to the chaplain that Eason first established his religious affiliations at the Hobby Unit, so he was clearly aware of the existence of this channel of communication. Finally, Eason testified that it was not until June 27, 1993, long after the

---

[2]     Even if Eason's assertions raise a fact-issue as to whether or not an administrative foul-up occurred regarding the religious designation on his travel card, this would amount to no more than a claim of negligence. Such a claim would not support his allegations of a constitutional violation in this context. *George*, 837 F.2d at 707.

11

lockdown at issue, that he first filed an official request at the Smith Unit concerning the dietary mandates associated with his religion. Eason has offered no evidence that he told any Smith Unit official in a position to act on such a communication of his religious affiliations. We therefore find that Eason has not raised a fact-issue pertaining to his claim that, during the 1992 lockdown, the defendants violated his constitutional right to practice his religion by knowingly failing to accommodate Eason's affiliation with the Muslim faith.

In his third point of error, Eason contends that he was denied his constitutional right of access to the law library during the lockdown. As we noted in *Eason v. Thaler*, if Eason was pursuing a legal action which necessitated his use of the law library and access to the library was denied, this deprivation could represent a violation of his constitutional rights. 14 F.3d at 9-10 (citing *Bounds v. Smith*, 97 S.Ct. 1491, 1498-1499 (1977)); *see also Morrow v. Harwell,* 768 F.2d 619, 622 (5th Cir. 1985). However, we also recognized that restrictions on direct access to legal materials may be warranted when prison security is involved. *Id*. (citing *Caldwell v. Miller*, 790 F.2d 589, 606 (7th Cir. 1986)). "While the precise contours of a prisoner's right of access to the courts remain somewhat obscure, the Supreme Court has not extended this right to encompass more than the ability of an inmate to prepare and transmit a necessary legal document to a court." *Brewer v. Wilkinson*, 3 F.3d 816, 821 (5th Cir. 1993) (footnote omitted), *cert. denied*, 114 S.Ct. 1081 (1994). Finally, to make out a claim

12

that his constitutional right of access to the courts has been violated, Eason must have demonstrated that his position as a litigant was prejudiced by his denial of access to the courts. *Walker v. Navarro County Jail*, 4 F.3d 410, 413 (5th Cir. 1993).

Eason testified at the *Spears* hearing that he was denied physical access to the prison library during the lockdown. He further testified that, of the twenty (legal) books he requested while confined to his cell, he received only sixteen. The prison librarian testified that Eason requested only twelve books during the lockdown, and that nine of these were delivered to him. While the disparity between these numbers is irrelevant, it provides context to the librarian's testimony that three of the books requested by Eason were already checked-out to other inmates. Eason offered no evidence to suggest that books were denied to him for reasons other than unavailability.

Any constitutional issue potentially raised by the prison's failure to provide Eason with every (legal) book he requested is of no consequence, however, in light of Eason's testimony demonstrating that he was not prejudiced in any litigation as a result of this alleged denial of access to the law library during the lockdown. In answers to a questionnaire and in testimony, Eason clarified that his denial of access to the courts had only one impact on litigation in which he was currently involved: he was delayed in filing a lawsuit under 42 U.S.C. Section 1983 in the Western District of Texas. Eason testified that he filed this suit after the lockdown had ended, and that he missed no deadlines in

13

doing so.  The lawsuit was subsequently dismissed, but due solely to Eason's failure—well after the lockdown ended—to respond to a motion.  Eason has not directed this Court's attention to any evidence in the record sufficient to raise a genuine issue of fact on this claim of denial of access to the prison law library.

In his final point of error, Eason contends that he was exposed to natural gas during the lockdown as the result of a gas leak which occurred on November 20, 1992.  In his initial appellate brief, Eason argued that this gas leak constituted gross negligence on the part of the defendants, for which liability could be imposed under the Civil Rights Act.  In his supplemental brief, Eason suggested that his exposure to the natural gas constituted cruel and unusual punishment.

We hold that Eason was deemed to have abandoned this claim by not raising it in the brief he submitted to this Court in his original appeal, *Eason v. Thaler*, 14 F.3d 8 (5th Cir. 1994).  In that opinion, we considered only those claims presented in Eason's complaint which he expressly put before this Court on appeal; we deemed the other claims presented in his complaint to have been abandoned.  *Id.* at 9 & n. 1.  Eason included an allegation relating to the November 20 gas leak in his original complaint; he did not, however, raise this issue in his original appeal to this Court.  We hold that the district court exceeded the scope of the remand in addressing this abandoned issue.  *See Daly v. Sprague*, 742 F.2d 896, 900-901 (5th Cir. 1984).

Furthermore, while it is clear that Eason abandoned his claims relating to the November 20 gas leak, we note that Eason has presented no evidence in support of his claim that the prison officials' gross negligence in permitting the gas leak to occur constituted cruel and unusual punishment.[3]  In a recent opinion, the Supreme court held that, in order for a prison official to violate the Cruel and Unusual Punishments Clause, that official must be "deliberately indifferent" to an inmate's health or safety. *Farmer v. Brennan*, 114 S.Ct. 1970, 1977 (1994).  The Court clarified in *Farmer* that the test for "deliberate indifference" was "subjective recklessness as used in the criminal law".  114 S.Ct. at 1980.

In the present case, Eason alleges that a gas leak occurred in his building while repairs were being made to the central heating system.  He testified that officials responded quickly to the outcry raised by the inmates, releasing the inmates in A-wing—where the alarm had first been given—within a matter of minutes; as to the inmates housed in B-wing with Eason, however, prison officials decided to leave them in their cells, choosing instead to turn on the exhaust fans and relying on those fans to draw the gas out of the B-wing cells.  Eason further testified that, from the moment he first detected the gas, he could smell gas in the air for only five to seven minutes before it was drawn away by the exhaust fans.

---

[3]  We do not consider Eason's claim under section 1983 as negligence is not a theory for which liability may be imposed under section 1983.  *Daniels v. Williams*, 106 S.Ct. 662 (1986); *Davidson v. Cannon*, 106 S.Ct. 668 (1986); *Love v. King*, 784 F.2d 708 (5th Cir. 1986).

Conceding that officials reacted to the problem in a reasonable amount of time, Eason distilled his complaint to the following: (unnamed) prison officials could have avoided this gas leak, but they failed to do so.  Putting aside that Eason offered no evidence as to <u>who</u> was responsible for this alleged failure nor <u>how</u> the unnamed party or parties failed in their duties, the Supreme Court's opinion in *Farmer* clearly dispenses with this claim.

## Conclusion

Having concluded that Eason has failed to direct this Court's attention to any evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial, the judgment of the district court is accordingly

AFFIRMED.

16