United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 14, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 02-50189

ROGELIO P. PEREZ,

Plaintiff - Appellant,

VERSUS

HOUSING AUTHORITY OF THE CITY OF UVALDE; ENRIQUE L. VASQUEZ,
MEMBER-BOARD OF COMMISSIONERS OF THE HOUSING AUTHORITY OF THE
CITY OF UVALDE; SHIRLEY ZAMORA, MEMBER-BOARD OF COMMISSIONERS OF
THE HOUSING AUTHORITY OF THE CITY OF UVALDE; IRMA FUENTES,
MEMBER-BOARD OF COMMISSIONERS OF THE HOUSING AUTHORITY OF THE
CITY OF UVALDE; CRUZ HERNANDEZ, MEMBER-BOARD OF COMMISSIONERS OF
THE HOUSING AUTHORITY OF THE CITY OF UVALDE; CITY OF UVALDE; GUS
NEUTZE, MAYOR, CITY OF UVALDE.

Defendants - Appellees

Appeal from the United States District Court
For the Western District of Texas, Del Rio Division

(00-CV-14)

Before WIENER, BENAVIDES, and DENNIS, Circuit Judges.[*]

DENNIS, Circuit Judge:

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

Appellant Rogelio P. Perez appeals the district court's grant of summary judgment on his due process and First Amendment claims. For the following reasons, we affirm.

## I. Background

Perez was employed as Executive Director for the Housing Authority of the City of Uvalde ("UHA") from 1993 until his termination on February 10, 2000, and was under contract with the UHA until November 30, 2003. In September 1999, Appellee Enrique Vasquez was named Chairman of the UHA Board by Appellee Gus Neutze, the newly-elected Mayor. Perez had actively opposed Neutze's election, believing that Neutze was opposed to affordable housing. After his election, Mayor Neutze appointed new members to the UHA Board.

On September 20, 1999, the UHA received a letter from the Department of Housing and Urban Development ("HUD") expressing concern about the severe financial condition of the UHA's Section 8 housing program, a federal program designed to subsidize rents for low-income residents. The UHA would develop a budget that anticipated the funds needed to administer the program, and HUD would then forward funds to the UHA to pay landlords for this subsidized housing. As the UHA received revenue from tenant contributions, it would reimburse those funds to HUD.

The HUD letter stated that the UHA had been over-requisitioning funds from HUD since 1993 and that mismanagement and

a lack of proper oversight resulted in the UHA owing HUD $283,515 as of June 30, 1999. In addition, HUD accused the UHA of using HUD funds to pay for non-HUD projects. HUD required the UHA to take immediate action to remedy this deficit or face administrative sanctions, including the possible termination of the UHA's management of the Section 8 program. Specifically, it required the UHA to submit a detailed Improvement Plan to address the deficiencies and to set forth specific milestones for improvement.

Perez, representing the UHA, submitted a Plan on October 26, 1999, which HUD rejected as unrealistic. HUD ordered the UHA to submit by November 24, 1999, "a revised, realistic Improvement Plan which will result in the reduction of the Section 8 Program deficit and repayment of all funds due to HUD." Instead of submitting a revised Improvement Plan, Perez sent a letter to HUD asking what specific changes HUD would consider acceptable and for any "realistic" suggestions it may have.

On November 15, 1999, the UHA Board held a meeting for Perez to report to the Board on a number of topics. These topics included: (1) the financial operating condition of the UHA since 1993; (2) the conversion of the Uvalde Housing Development Corporation ("UHDC") from an instrumentality of the UHA to a private non-profit corporation; (3) personal services and compensation received by Perez from the UHDC; (4) the expenditure of HUD funds for non-HUD purchases, including the purchase of the

Granada Apartments, now owned by the UHDC; and (5) the procurement of water stabilizers from Emissions Panther, Inc., including compensation received by Perez's son for the transaction. During the meeting, the Board engaged in an extensive discussion with Perez concerning the above issues. The agenda also included "[c]onsideration and possible action regarding the employment agreement with Mr. Rojelio [sic] P. Perez as Secretary and Executive Director of the Housing Authority, including evaluation, discipline or termination," although no employment action was taken at that time.

On January 18, 2000, another Board meeting was held. The agenda included plans to "deliberate the employment, evaluation, reassignment of duties, discipline, or dismissal of the Executive Director [Perez]." This discussion, however, was postponed because Perez did not have his lawyer present. Thus, discussion of Perez's job status was postponed until January 26, 2000.

The agenda for the Board's January 26, 2000 meeting included the "[c]onsideration and possible action regarding the employment agreement with Mr. Rogelio P. Perez as Secretary and Executive Director of the Housing Authority, including evaluation, discipline, or termination." The Board, with Perez present, extensively discussed Perez's job performance, including the deficits owed to HUD due to his over-requisitioning of Section 8 funds and the use of these funds for non-Section 8 purposes in

4

violation of the UHA's contract with HUD.  The Board also discussed his purchase of water stabilizers in 1994 without following proper bidding and disclosure regulations from Emissions Panther, Inc., where his son was employed.

Perez responded to these allegations, contending that his predecessor was responsible for the UHA's current dispute with HUD and that the previous Board had ratified his other activities. After this discussion, the Board did not take any further action. But on February 10, 2000, the Board held another meeting.  The meeting's agenda again included a discussion of Perez's possible termination.  At this meeting, without further discussion, the Board unanimously voted to terminate Perez's employment immediately.

After his termination, Perez filed suit in the Western District of Texas against the UHA, Mayor Neutze, and the individual Board members alleging constitutional violations involving due process and First Amendment retaliation.  Perez also brought state law claims alleging breach of contract and violation of the Texas Open Meetings Act.  The defendants filed for summary judgment, seeking dismissal on all claims.  On June 1, 2001, the district court adopted the magistrate's recommendations and dismissed all claims with prejudice except for the breach of contract claim, which was dismissed without prejudice to be considered in state

court.[1]  Perez timely appealed.

**II.  Analysis**

Perez contends that the UHA violated both his property and liberty interests protected by the due process clause of the Fourteenth Amendment because it failed to provide him notice of the reasons for termination and a reasonable opportunity to respond to the Board's contentions.  Perez also maintains that he was terminated for political reasons, not for job performance in violation of his First Amendment rights.  Because these claims were dismissed on summary judgment, we will review the decision *de novo*. *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1326 (5th Cir. 1996).

A.  *Property Interest*

Perez first argues that his termination resulted in a deprivation of his property interest in employment without procedural due process.  Specifically, he contends that he was not afforded sufficient notice and, thus, a meaningful opportunity to be heard prior to termination.

The Constitution guarantees that life, liberty, or property will not be taken by the government without due process of law. U.S. CONST. amend. XIV, § 1.  "Procedural due process considers not

---

[1]In addition, the district court held that the defendants waived any right to qualified immunity by failing to invoke immunity timely.  The defendants do not contest this finding on appeal.

6

the justice of a deprivation, but only the means by which the deprivation was effected." *Caine v. Hardy*, 943 F.2d 1406, 1411 (5th Cir. 1991). "Procedural due process is a flexible concept whose contours are shaped by the nature of the individual's and the state's interests in a particular deprivation." *Id.* at 1411-12.

"Ordinarily, a governmental entity may effect a deprivation only after it has provided due process." *Id.* at 1412. However, the necessary amount and kind of pre-deprivation process depends upon the balance of three factors: (1) the private interest that will be effected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedural requirements would entail. *Id.* at 1412; *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Under this balancing test, the Supreme Court has concluded that a governmental entity must accord a public employee effective notice and an informal hearing permitting the employee to give his version of events prior to termination. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). The Court held that a public employee "is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.*

7

We conclude that the UHA provided Perez due process prior to his termination.[2]  First, prior to Perez's termination on February 10, 2000, the Board had put Perez on notice that he was subject to possible termination.  The Board agendas, which were drafted by Perez, for its November 15, 1999, January 18, 2000, January 26, 2000, and February 10, 2000 meetings all listed as an item for discussion the possible termination of Perez's employment.  Perez was clearly aware that his employment was at issue because not only did he draft the agendas for the UHA meetings, he also had his attorney present at every meeting except that of January 18.  Thus, Perez was put on notice prior to February 10, 2000, that he was subject to termination.

Further, Perez was aware of the charges against him as well as the UHA's evidence on which it planned to base his termination.  At the November 18, 1999 UHA Board meeting Perez discussed with the Board his over-requisitioning of Section 8 funds, his use of Section 8 funds for non-section 8 purposes, and his purchase of water stabilizers when he had a conflict of interest.  These were the exact allegations the Board discussed with Perez on January 26.  Therefore, Perez was made aware of the Board's charges and evidence against him more than two months before his January 26 meeting with the Board.

_____

[2]  The parties do not dispute that Perez's employment contract with the UHA provided him with a valid property interest.

8

Finally, Perez had an opportunity to tell his side of the story prior to termination. At the January 26, 2000 meeting, Perez, with his attorney present, was able to respond to all of the UHA's accusations that he had not properly performed as Executive Director of the UHA. He was able to argue that the financial situation of the UHA was not his fault, but that of his predecessor, and he was able to contend that he acted properly with regard to his other activities.

Perez maintains that he did not receive formal, written reasons of the charges against him prior to termination, and thus he was not accorded constitutionally sufficient notice of the reasons for termination. This argument is without merit. A governmental entity is not required to provide formal, written reasons for termination in order to provide procedural due process. *See Loudermill*, 470 U.S. at 546. Instead, the governmental entity needs to provide notice "reasonably calculated to apprise the accused of the pending action and to afford himself an opportunity to defend himself." *See Everhart v. Jefferson Parish Hospital District*, 757 F.2d 1567, 1570 (5th Cir. 1985)(quoting *Knight v. La. State Board of Medical Examiners*, 211 So.2d 433, 438 (La. Ct. App. 1968)). For the reasons given above, we conclude that UHA Board provided such notice. Accordingly, we find the district court properly granted summary judgment on this claim.

B. *Liberty Interest*

Perez next maintains that the district court improperly granted summary judgment on his liberty interest claim. "A constitutionally protected liberty interest is implicated only if an employee is discharged in a manner that created a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities." *White v. Thomas*, 660 F.2d 680, 684 (5th Cir. 1981); *Hughes v. City of Garland*, 204 F.3d 223, 226 (5th Cir. 2000).

This court has enunciated a test to be used when examining a liberty interest claim related to public employment. In order to prevail, the plaintiff must prove: (1) he was discharged; (2) stigmatizing charges were made against him in connection to the discharge; (3) such charges were false; (4) he was not given notice or an opportunity to be heard prior to the discharge; (5) the charges were made public; (6) he requested a hearing to clear his name; and (7) the employer refused the request for a hearing. *Hughes*, 204 F.3d at 226. Perez's liberty interest claim fails because, as stated above, he was given notice and an opportunity to be heard prior to discharge. In addition, there is no evidence that he ever requested a name-clearing hearing, let alone proof that this request was refused.[3] Therefore, this argument is

---

[3] Although he contends that he had no opportunity to request a name-clearing hearing, there is no requirement that the name-clearing hearing occur before termination. *Rosenstein v. City of Dallas*, 876 F.2d 392, 396 n.8 (5th Cir. 1989) (holding that "the State is not required to tender [a name-clearing hearing] prior to

without merit.

C.   *First Amendment Retaliation*

Finally, Perez argues that the district court improperly granted summary judgment on his First Amendment retaliation claim. To prevail on a First Amendment retaliation claim, the plaintiff must prove: (1) he suffered an adverse employment decision, (2) his speech involved a matter of public concern, (3) his interest in commenting on matters of public concern outweighed the defendant's interest in promoting efficiency, and (4) the speech motivated the defendant's actions. *Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 366 (5th Cir. 2000).

Here, the parties concede that Perez suffered an adverse employment decision and that his speech involved a matter of public concern. Therefore, we need only consider the remaining two elements. Because the district court based its decision to grant summary judgment on whether Perez's speech motivated his termination, we will consider that issue first.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(e). A dispute

---

disclosing the charges or discharging the employee."). Therefore, Perez had ample opportunity to request a name-clearing hearing after termination.

11

about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). The movant must initially demonstrate the absence of a material fact issue. *Id.* "If it satisfies that burden, the non-movant must identify specific evidence in the summary judgment record demonstrating that there is a material fact issue concerning the essential elements of its case for which it will bear the burden of proof at trial." *Id.* Mere conclusory allegations are not competent summary judgment evidence and are insufficient to overcome a summary judgment motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1984); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).

Here, the defendants maintain that Perez was fired for his management of the UHA and argue that summary judgment was proper because Perez can not prove that his termination was based on his political activities. To avoid summary judgment, Perez must provide specific evidence that his termination was politically motivated. To prove he was terminated for political reasons, Perez provided a number of affidavits and depositions, as well as his own deposition testimony. The district court concluded that his deposition testimony was conclusory and held that he had not demonstrated that he was terminated as retaliation for his political activities.

On appeal, Perez does not contend that the district court's

12

characterization of his deposition testimony as conclusory was erroneous. Instead, he argues that the district court failed to consider the other affidavits and deposition testimony he submitted and that this evidence was sufficient to allow a reasonable jury to conclude that he was terminated due to his political activities.

Although Perez is correct that the district court did not expressly consider this additional evidence, we disagree that this evidence is sufficient to allow his First Amendment claim to survive summary judgment. Most of the depositions and affidavits submitted by Perez only contain either conclusory statements that the termination was political "pay-back" without any substantive proof or discussion of statements by non-defendants who wished to see Perez fired. Of this evidence submitted by Perez, the testimony of only three individuals provides specific evidence that a member of the UHA Board planned to terminate Perez prior to his actual termination.

Two affidavits and a deposition show that Enrique Vasquez, the UHA Board Chairman who voted to fire Perez, stated before Perez's termination that he wanted Perez fired. Even assuming that this testimony would be admissible at trial, these statements fail to provide any evidence that Vasquez or any other member of the UHA Board wanted Perez terminated because of his political activities. In fact, the statements provide evidence to the contrary. Amaro Cardona's affidavit provides that Vasquez "stated that Rogelio

13

Perez should be fired for stealing from the Uvalde Housing Authority." Antonio Ruiz's affidavit states that he was going to fire Perez because he was "wrong." And in his deposition, Josue Garza testified that Vasquez told him that he wanted Perez fired because he had lied on his initial application by not documenting all of his previous employers. Thus, the only specific evidence Perez presented shows that Vasquez had non-political reasons for wanting to terminate Perez's employment.

Because the affidavits and deposition testimony submitted by Perez do not provide evidence that he was terminated for political reasons, he has not shown that a reasonable jury could return a verdict in his favor on this claim. Therefore, we conclude that the district court properly granted summary judgment in favor of the defendants.

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment on Perez's due process and First Amendment retaliation claims.

14