# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-10298
Summary Calendar

United States Court of Appeals
Fifth Circuit

**FILED**
December 1, 2015

Lyle W. Cayce
Clerk

MARTIN QUINTANA,

      Plaintiff - Appellant

v.

FUJIFILM NORTH AMERICA CORPORATION,

      Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:13-CV-2505

Before STEWART, Chief Judge, OWEN, and COSTA, Circuit Judges.

PER CURIAM:*

      Plaintiff-Appellant Martin Quintana ("Quintana") appeals the district court's grant of a motion for summary judgment in favor of Fujifilm North America Corporation ("FNAC"). Quintana challenges the district court's dismissal of his claims of (1) age and race discrimination, (2) retaliation, and (3) hostile work environment in violation of the Texas Commission on Human Rights Act ("TCHRA"), Texas Labor Code § 21.001 *et seq.* Specifically, at issue

---

      * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-10298

on appeal is whether the district court properly granted summary judgment in favor of FNAC on each of Quintana's aforementioned claims.  We AFFIRM.

I.

**A. Quintana's Employment with FNAC**

Viewing the facts in the light most favorable to Quintana, on or about January 23, 2006, FNAC hired Quintana, a 48-year-old Hispanic male, to work in its Graphics Systems Division as a Digital Solutions Specialist, Sales ("DSS").  FNAC's Graphic Systems Division ("FNAC-GSD") supplies graphic imaging equipment and related products and services.  The Digital Solutions Group is responsible for selling imaging solutions and Xerox products to FNAC customers.  Quintana was responsible for the sale of digital press equipment, platesetters, workflow, and related products and services, as well as expanding FNAC-GSD's business base and cross-selling of products and services to existing FNAC-GSD customers.

While employed with FNAC-GSD, Quintana was supervised first by Phil Kane ("Kane"), who was the Vice President of Digital Sales.  In 2011, Quintana began to report to Ron Peterson ("Peterson"), the National Director of Sales Solutions.  Peterson reported to John Solwold ("Solwold"), the Vice President of Field Sales.  Solwold in turn reported to Todd Zimmerman ("Zimmerman"), Vice President & General Manager.  Peterson, Solwold and Zimmerman are all Caucasian males.

Throughout Quintana's employment, he experienced success as a top equipment sales representative and performed in the top four or five in sales each year since his hiring in 2006.  He consistently received "Exceptional Performance" and "Successful Performance" evaluation ratings.

**B. Quintana's May 2, 2012 Conversation with Peterson**

On May 2, 2012, while  participating in sales calls in Austin, Texas, Quintana engaged in conversation with Peterson about the diversity of the

No. 15-10298

FNAC team.   Peterson stated that Quintana's sales group looked like a bunch of "graying old [white] men."   Peterson subsequently discussed the lack of diversity with FNAC's Human Resources Department ("Department"), but received no response or showing of concern from the Department.   Quintana, however, did not directly raise his concerns with the Department following his conversation with Peterson, or at any point during his employment with FNAC.

### C. Quintana's Allegations of Harassment

Quintana alleges that he experienced conduct that amounted to harassment and a hostile work environment.   Specifically, he alleges that (1) he was the subject of a territory realignment which resulted in an inferior sales territory, (2) FNAC initially failed to pay Quintana's commissions sales, (3) Peterson and Solwold would not participate in sales calls with Quintana, (4) Quintana received a threatening letter form Solwold regarding protocol for sales of equipment, and (5) Solwold commented on Quintana's 2011 performance evaluation in a threatening manner, stating that Q did not agree with Quintana receiving a high rating on his evaluation.

### 1. Sales Territory Realignment

Prior to Quintana's termination, Kane approached him about becoming a specialist to sell FNAC's new J2 press equipment—a larger and faster product than what Quintana was previously selling—to which Quintana expressed an interest in being involved.   However, because the press would not be immediately available for sale, Kane requested that Quintana serve as a sales person for a new sales territory for a temporary 90-day period.  Quintana relinquished half of his sales territory to Robert Nordman ("Nordman"),

3

No. 15-10298

another FNAC-GSD employee, for this period. [1]  After the 90-day period, the sales territory was not restored.  According to Quintana, the sales territory he was given was inferior to that of Nordman.  This realignment became permanent for all sales associates.

The territory realignment occurred while Kane, and not Peterson, served as Quintana's supervisor.  Quintana, however, did not allege that Kane holds any discriminatory animus toward him.  In fact, after Kane approached Quintana about selling the new J2 press, Quintana expressed that he did not believe that Kane's decision was discriminatory.

### 2. Earned Commissions

FNAC did not initially pay commissions to Quintana for two of Quintana's customer sales—Print Place and Nationwide.  As a DSS, Quintana received commissions as a part of his employment.  Under FNAC's commissions program, commissions are earned upon the installation of the equipment for the customer.  Quintana serviced both the Print Place and Nationwide accounts prior to the realignment, but the equipment from those sales were installed in Nordman's territory following the change.  Although FNAC paid Quintana the entire commission for Print Place and fifty percent of the Nationwide commission, FNAC testified that the installation of the equipment occurred outside of Quintana's territory, making him ineligible to receive the commissions.

### 3. The Absence of Sales Calls with Peterson and Solwold

Neither Peterson nor Solwold participated in any sales calls with Quintana, who continued to boast the highest Digital Press sales in the

---

[1] Nordman is three years younger than Quintana.  He is a Caucasian male and the only other employee who held the position of DSS reporting to Peterson in the Dallas area.

company and who maintained an exceptional sales record. Both Peterson and Solwold engaged in calls with Nordman.

### 4. Solwold's Alleged Harassment of Quintana

While on a conference call in early 2011, Quintana voiced his objection to a new compensation plan which Solwold announced to Quintana and the roughly 20 men on Peterson's sales team. Following the telephone call, Solwold sent a memo to Quintana reinforcing the protocol which account managers must follow. Because FNAC develops and sells numerous equipment services, and because FNAC seeks to develop additional sales opportunities separate and apart from the initial equipment sales made by a DSS, Solwold informed Quintana that he must communicate with the rest of his team prior to finalizing a sale. If he does not, a sale before speaking with the rest of his team would preclude the team from capitalizing on additional opportunities to work with the customer on the sale of additional products. In a second incident and after Quintana received the highest rating on his 2011 performance evaluation, Solwold made a notation in which he stated that he did not agree with such a high rating.

### D. FNAC's Reduction in Force Determination

In June 2012, just under six and a half years after Quintana joined FNAC, FNAC engaged in a nationwide reduction-in-force ("RIF"). In a memorandum to all GSD employees dated June 6, 2012, FNAC gave notice to company employees that due to the economic crisis that continued to have a negative impact on FNAC's overall business, the moderate improvement from the Graphics System Division, the system in which Quintana worked, was not yet at a sustainable level. Accordingly, the RIF resulted in the termination of nine employees across the country—one of them being Quintana.

In FNAC's memorandum, FNAC management did not provide the criteria within which the RIF would be executed. However, as stated in a

declaration from Michael Prutting, Vice President of Human Resources for FNAC, the employees selected for the RIF were chosen based on "their location, business function, duplicative or redundant job position and tenure." Zimmerman and Solwold made the decision as to which sales employees would be affected by the RIF.

At the time of the RIF, Quintana and roughly nineteen other employees were supervised by Peterson. All were male but the two minorities in the group were Quintana and Joe Galindo, a Hispanic male that worked in a separate FNAC-GSD market (Los Angeles). Quintana and Nordman were the only two employees in the Dallas area who worked as DSS representatives and reported to Peterson. Of the two, Quintana had a tenure with FNAC-GSD of 6.4 years, Nordman of twenty years. FNAC alleges that despite Quintana's high performance, Dallas and Los Angeles were two of the lowest performing regions. FNAC reasoned that Quintana was terminated from the DSS position in the Dallas area because of his tenure of 6.4 years. In the Los Angeles area, the DSS selected for the RIF similarly had the shortest tenure.

### E. Procedural History

On July 26, 2012, Quintana filed a charge with the Equal Employment Opportunity Commission ("EEOC") and the TCHRA alleging age, race and national original discrimination. Quintana also alleges that he experienced retaliation and harassment and worked in a hostile work environment. The EEOC issue a Notice-of-Right-to-Sue and Quintana filed suit on May 22, 2013 in state court. Following timely removal to federal court, FNAC filed a motion for summary judgment as to each of Quintana's claims. FNAC argued that Quintana failed to establish a prima facie case of discrimination or retaliation. They contended that even if the district court made a finding that Quintana did in fact establish a prima facie case, he failed to raise a genuine issue of material fact that FNAC's legitimate, nondiscriminatory reasons for

terminating Quintana were mere pretext or retaliatory. Quintana opposed the motion, reiterating his original claims, and arguing that FNAC subjected Quintana to a hostile work environment until he was terminated based on his race, national origin, and age, and in retaliation for complaining of discrimination and harassment to Quintana's direct supervisor. On March 30, 2015, the district court granted FNAC's motion for summary judgment and dismissed all claims with prejudice.

## II.

"We review a district court's grant of summary judgment de novo." *James v. State Farm Mut. Auto. Ins. Co.*, 743 F.3d 65, 68 (5th Cir. 2014). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits. . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 323–25 (1986). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 284 (1986). When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp.*, 477 U.S. at 323. When the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is "no genuine [dispute] for trial." *Matsushita*, 475 U.S. at 587 (citation omitted). Mere conclusory allegations are not competent summary judgment evidence and

cannot defeat a summary judgment motion. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).

Once the moving party has made the initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). To satisfy this burden, they are required to identify specific evidence in the record, and to articulate the "precise manner" in which that evidence supported their claim. *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994). If disputed facts "that might affect the outcome of the suit under the governing law" exist, entry of summary judgment may be precluded. *Anderson*, 477 U.S. at 248. However if the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the moving party is entitled to judgment as a matter of law and summary judgment must be granted. *Celotex*, 477 U.S. at 322–23. We may affirm a summary judgment on grounds other than those relied upon by the district court when there is an adequate and independent basis for that disposition. *Morales v. Dep't of Army*, 947 F.2d 766, 768 (5th Cir. 1991).

In this case, the district court rendered summary judgment in favor of the Defendants on all issues. On appeal, we are bound by the same standard that controls the district court. *Id.* at 768.

### III.

After considering the parties' arguments as briefed on appeal, and after reviewing the record, the applicable law, and the district court's judgment and reasoning, we AFFIRM the district court's judgment and adopt its analysis in full.